# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| GPI-AL, INC., | ) |
| Plaintiff, | ) ) ) |
| v. | ) CIVIL ACTION 17-0511-WS-MU |
| NISSAN NORTH AMERICA, INC., | ) ) ) |
| Defendant. | ) |

## ORDER

This matter comes before the Court on plaintiff's Motion to Exclude Expert Testimony of Sharif Farhat (doc. 96). The Motion has been extensively briefed and is now ripe.

**I.     Relevant Background.**

This action arises from Nissan North America, Inc.'s decision to establish a new Nissan automotive dealership by declaring an "open point" in west Mobile, Alabama. The existing Nissan dealership in Mobile, GPI AL-N, Inc. d/b/a Nissan of Mobile ("Nissan of Mobile"), brought this action alleging that Nissan North America's ("NNA") attempt to establish a new dealership in this market violated Alabama Code § 8-20-4 in multiple respects as an unfair and deceptive trade practice, and that it also breached several provisions of the Dealer Agreement between Nissan of Mobile and NNA.

In reaching its decision to declare an open point in west Mobile, NNA hired a consulting and software development company called Urban Science Applications, Inc. ("USAI") to perform a study of the Mobile, Alabama market. USAI is the automotive industry's leading provider of dealer network analysis, which may involve evaluating and determining the proper number and location of automotive dealers in a particular market area for adequate brand representation. (PageID.2134-35.) The resulting market study in the fall of 2015 was performed primarily by USAI analyst Dan Hopfensperger. (PageID.1104.) In carrying out this study, Hopfensperger applied USAI's eight-step methodology for market studies, to-wit:

> "[T]he first step is defining an area that's relevant to study for the issue at hand or the market that's being studied. The second step is determining a market share

> standard to assess the area or the relevant areas. The third step is to measure the performance of the areas based on that standard. The fourth step would be to assess the likely causes of that performance. The fifth step would be to propose a solution …. The sixth step would be to measure the impact of that solution. The seventh step would be to identify comparable experiences to confirm or help explain the basis for the solution and the results. And the eighth step would be to … finalize the recommendations and the market study."

(PageID.1105.) The conclusion of USAI's fall 2015 study was a recommendation that west Mobile should be deemed a "monitored market," meaning that it would be monitored on a going-forward basis for possible future representation (*i.e.*, for potential establishment of an additional Nissan dealership). (PageID.1112, 2137.)

Following that initial recommendation from USAI, NNA continued to monitor the Mobile market and, in early 2017, decided to establish a new dealer in west Mobile. Upon commencement of this litigation by Nissan of Mobile, NNA retained USAI to perform further analysis of the Mobile market, using additional years of data not available in 2015 and early 2016 when USAI's prior recommendation was made. (PageID.2137.) For this project, NNA designated Sharif Farhat, Vice President of Expert Analytical Services for USAI, as an expert witness. Over the course of his 30-year career at USAI, Farhat has personally managed hundreds of dealer network analysis projects. (PageID.2165.) Farhat has provided expert testimony in more than 100 litigated matters before various courts and boards, including matters involving dealer network analysis, and has never been excluded from providing such opinions and analysis. (PageID.2135.) Among Farhat's conclusions from his analysis of the Mobile market in this litigation were that the Nissan brand suffered from "deficient market penetration (*e.g.*, inadequate representation)" in the Mobile market, and that the "primary cause" of that shortcoming was that "there are too few Nissan sales and service facilities available in the Mobile Metro. … This can be solved by adding another Nissan dealer in the Mobile Metro." (PageID.2161.)[1]

Nissan of Mobile now moves for exclusion of Farhat's expert opinions and analysis in this case in their entirety. As grounds for this Motion, Nissan of Mobile argues that Farhat's methodology is too subjective because it "makes no adjustments for local market conditions,"

---

[1] In evaluating brand performance, Farhat examined data on vehicle registrations for the Nissan brand, both relative to a particular benchmark and by comparing market share data for certain areas of the Mobile market with that for other areas in the Mobile market.

"fails to account for differences in competitive environment," involves the use of an "unreasonable performance standard," and conflicts with the conclusions reached by USAI less than three years earlier in the Hopfensperger study. (PageID.2021-22.)

## II. Analysis.

### A. *Legal Standard for Admissibility of Expert Testimony.*

The Federal Rules of Evidence, as construed by the Supreme Court in the landmark case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), "require[] expert scientific evidence to be both reliable and relevant pursuant to Rule 702," such that it "appropriately assists the trier of fact." *United States v. Henderson*, 409 F.3d 1293, 1302 (11th Cir. 2005). In that regard, "[t]he court serves as a gatekeeper, charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand." *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1250 (11th Cir. 2007). "The proponent of the expert testimony carries a substantial burden under Rule 702" to show admissibility by a preponderance of the evidence. *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1107 (11th Cir. 2005); *see also Boca Raton Community Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009) ("The offering party must show that the opinion meets the *Daubert* criteria, including reliable methodology and helpfulness to the factfinder …, by a preponderance of the evidence.").

As a general proposition, "[i]n determining the admissibility of expert testimony under Rule 702, a district court considers whether (1) the expert is qualified to testify competently regarding the matter he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *United States v. Douglas*, 489 F.3d 1117, 1124-25 (11th Cir. 2007); *see also Knight through Kerr v. Miami-Dade County*, 856 F.3d 795, 808 (11th Cir. 2017) (similar). "While there is inevitably some overlap among the basic requirements – qualification, reliability, and helpfulness – they remain distinct concepts and the courts must take care not to conflate them." *Rosenfeld v. Oceana Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (citation omitted).

Courts have emphasized that "[t]he rules relating to *Daubert* issues are not precisely calibrated and must be applied in case-specific evidentiary circumstances that often defy

generalization." *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005). Moreover, a district court's gatekeeper role "is not intended to supplant the adversary system or the role of the jury." *United States v. Alabama Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013) (citations omitted). Even in the wake of *Daubert*, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (citations omitted). "[I]n most cases, objections to the inadequacies of a[n opinion] are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Id.* (citations omitted). Thus, disagreements as to the manner in which an expert performs an analysis may best "be aired out in front of the jury and tested by the crucible of cross-examination," without implicating the *Daubert* gatekeeping function. *Tampa Bay Water v. HDR Engineering, Inc.*, 731 F.3d 1171, 1185 (11th Cir. 2013). Moreover, where – as here – the matter is set for bench trial, not a jury trial, "the traditional barriers to opinion testimony … are even more relaxed …. There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself." *Brown*, 415 F.3d at 1268-69.

In its *Daubert* Motion, Nissan of Mobile does not challenge Farhat's qualifications in his field and does not dispute the helpfulness prong. (PageID.1006.) Rather, plaintiff's sole attack on admissibility focuses on reliability. Plaintiff posits that Farhat's method "generally lacks any semblance of reliability," that it is "based on data that is so biased in favor of NNA's position, it cannot form the basis of any reliable scientific opinion," and that Farhat "has failed to reliably apply his already unreliable principles and methods to the facts of this case." (*Id.*)

The "reliability" prong of the *Daubert* analysis examines "whether the reasoning or methodology underlying the testimony is scientifically valid and … whether that reasoning or methodology properly can be applied to the facts in issue." *Seamon v. Remington Arms Co.*, 813 F.3d 983, 988 (11th Cir. 2016) (citation omitted). In determining whether an expert's methodology is reliable, courts generally consider "(1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community." *Id.* (citations omitted). That said, the foregoing list is not exhaustive; rather, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether

particular expert testimony is reliable." *Knight*, 856 F.3d at 809 (citation omitted). At all times in this flexible inquiry, the court's focus must be "solely on principles and methodology, not on the conclusions that they generate." *Seamon*, 813 F.3d at 988 (citation omitted). "In evaluating the reliability of an expert's method, … a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 n.7 (11th Cir. 2005).

      **B.**      *Selection of the Comparison Market.*

In challenging the reliability of Farhat's methods, Nissan of Mobile places particular emphasis on his selection of a comparison market or benchmark for evaluating the adequacy of Nissan's brand representation in the Mobile market. In his capacity as Rule 30(b)(6) representative of USAI, Farhat testified that the objective in designating such a benchmark was to identify "geographic areas that are performing at a level you would expect to be achievable when you have an adequate network, an adequate network being the right number, the right location, dealers operating in an aggressive matter, et cetera." (PageID.1106.) According to Farhat, the methodology is to identify potential comparison markets, select one with a higher performing market share,[2] and then "test it to see if that's reasonable to expect in the market you're studying." (PageID.1106-07.) To make that reasonableness assessment, Farhat would look to see if that comparison market share was being achieved in areas within and around the market being studied, by examining particular portions or subsections of that market. (PageID.1107.) After testing to determine the reasonableness of that comparison market, Farhat would compare market shares in the market being studied versus the market share being achieved in the benchmark, as a means of measuring overall brand performance in the Mobile market. (*Id.*) Farhat selected the "Nashville Area Represented Markets" as the comparison market for the Mobile market. The Nashville Area is a sprawling geographic area comprised of

---

      [2]      Farhat later clarified this point by explaining, "It is critical that the comparison area selected not be inadequately represented. If the comparison area was inadequately represented, then the area being measured may appear to be adequately represented simply because it had penetration equal to another inadequately represented area. This would be analogous to concluding a failing student was performing adequately because his performance equaled the performance of a group of failing students." (PageID.2156.)

nearly all of Alabama, plus a large chunk of western Tennessee and portions of the Florida Panhandle, Mississippi, Arkansas, Missouri and Kentucky. (PageID.2156, 2183.)

Plaintiff is sharply critical of Farhat's methodology in selecting the Nashville Area as a benchmark. In particular, Nissan of Mobile maligns that choice as encompassing NNA's headquarters in Tennessee, plus two Nissan manufacturing plants near Nashville, which plaintiff says artificially inflates Nissan's representation in that market, and therefore renders the benchmark unreasonable.[3] Plaintiff balks that the decision of what benchmark to select is "left to the sole discretion of the analyst … and is subject to significant bias (depending on whether the analyst wants the decision to be one or the other)." (PageID.1008.) Nissan of Mobile directly accuses of Farhat of bias, insisting that he "purposefully chose an unrealistic standard" in order to reach a predetermined result that the Nissan brand is underrepresented in the Mobile Market so as to justify adding another dealership to that market. (PageID.2439.)

Plaintiff's characterization of Farhat's selection of the Nashville Area comparison market as biased and unreliable is at odds with substantial record facts.[4] In his capacity as USAI's Rule 30(b)(6) deponent, Farhat testified in some detail about the steps he took to test the Nashville Area and "assess the reasonableness of that level of performance." (PageID.2120-29.) In particular, Farhat conducted an analysis to establish that at various census tracts within the Mobile Market, Nissan brand performance actually exceeded the standard of the Nashville Area,

---

[3] Plaintiff's reasoning goes something like this: One would expect Nissan to perform better in the market where its corporate headquarters and manufacturing facilities are located because NNA employees would be expected to be more likely to buy Nissan vehicles than non-NNA employees would. As such, the mere presence of these facilities in the Nashville Area skews the Nissan brand performance figures too high for that market to be reasonably utilized as a comparison or benchmark to the Mobile Market, which lacks both a Nissan corporate headquarters and Nissan manufacturing facilities.

[4] It also overlooks the fact that Farhat's analysis does not turn on the specific benchmark used. As he opined, the data he collected reflects a "significant variance in Nissan performance between east and west Mobile" regardless of the benchmark utilized, such that the shortfall in Nissan's brand performance in the Mobile West area where the new dealership is being contemplated "cannot be explained by alternative benchmarks." (PageID.2207.) In Farhat's analysis, then, the benchmark used – and the reasons for his conclusion that Nissan brand representation is significantly underperforming in the area where the new proposed dealership would be located – is only a piece of the puzzle, and is not ultimately driving the analysis or the conclusions.

supporting a conclusion that such a benchmark is neither unreasonable nor unachievable for the Mobile Market. Farhat also tested the reasonableness of the Nashville Area benchmark by comparing it to the level of Nissan brand performance at various markets in geographic proximity to the Mobile Market, such as Pascagoula, MS; Dothan, AL; Panama City, FL; and Marianna, FL. In each of these comparisons of areas reasonably close to or adjacent to the Mobile Market, Farhat found that the comparator market equalled or exceeded the performance of the Nashville Area, thereby reinforcing the reasonableness of the selection of the Nashville Area as a performance standard for the Mobile Market.

This and other record evidence confirms that, contrary to plaintiff's suggestion, Farhat did not arbitrarily select the most outrageous, highest, most stringent benchmark he could find, without performing any tests or assessment of its reasonableness.[5] The analysis that Farhat performed upon identifying the Nashville Area as a potential comparison market contains sufficient indicia of reasonableness to withstand *Daubert* reliability scrutiny. To the extent that Nissan of Mobile is dissatisfied with his use of that benchmark, plaintiff is free to explore that issue with him on cross-examination to bring out facts demonstrating the elements of subjectivity that factored into that decision. But this is not a persuasive basis for excluding the testimony altogether. Expert opinions need not be steeped entirely in objective, mathematical precision in order to be admissible; rather, they can properly include subjective components that draw on the witness's personal knowledge and experience. *See, e.g., American General Life Ins. Co. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1338 (11th Cir. 2009) ("A district court may decide that nonscientific expert testimony is reliable based upon personal knowledge or experience.") (citation and internal quotation marks omitted).

### C.    *West Mobile versus East Mobile Primary Market Areas.*

A critical component of Farhat's methodology was his analysis of Nissan brand performance in the eastern part of the Mobile market (where the current Nissan of Mobile dealership is located) as compared with Nissan brand performance in the western part of the Mobile market (where NNA has established an "open point" and proposes to add a new

---

[5] Plaintiff has expressly argued that "the selection of the comparison area boils down to what area is the highest performing benchmark possible for use." (PageID.2439.) The record, and particularly the objective testing done by Farhat to confirm the reasonableness of the selected benchmark, belies that characterization.

dealership). Farhat's analysis reflected that in the Mobile East primary market area ("PMA"), Nissan brand performance was essentially on track with that of the expected benchmark in 2017 and 2018, whereas in the Mobile West PMA, Nissan's brand performance chronically lagged behind that of the benchmark from at least 2014 onward. (PageID.2158, 2177-78, 2181.) This analysis demonstrated that the Mobile West PMA "always performs well below [the Mobile East PMA] regardless of the time period or the standard used." (PageID.2158.) On that basis, Farhat concluded that Mobile West "is not being adequately represented by the current Nissan dealer network." (*Id.*)

In its Reply, plaintiff objects that Farhat's division of the Mobile Market into two PMAs for purposes of his analysis is "arbitrary" and was done only after NNA "realized it had no other reasonable means of supporting its arguments." (PageID.2437-38.) Plaintiff goes on to point out that the USAI study performed in fall 2015 did not divide the Mobile Market into eastern and western portions, and that Farhat himself often treated the Mobile Market as a whole. According to Nissan of Mobile, "[t]he Mobile market truly should be considered a single PMA." (*Id.*)

The trouble with this line of objections by Nissan of Mobile is twofold. First, these criticisms were primarily articulated by plaintiff as new arguments in a reply brief, even though this aspect of Farhat's methodology and its importance to his conclusions is evident from reviewing his initial expert report dated October 5, 2018. This is improper. *See, e.g., Brown v. CitiMortgage, Inc.*, 817 F. Supp.2d 1328, 1332 (S.D. Ala. 2011) (explaining that "it is improper for a litigant to present new arguments in a reply brief" and that "[n]ew arguments presented in reply briefs are generally not considered by federal courts"); *Kirksey v. Schindler Elevator Corp.*, 2016 WL 7116223, *6 (S.D. Ala. Dec. 6, 2016) ("As an initial matter, this argument is improper because it is newly raised in a reply although it was available earlier."). Second, many of plaintiff's stated objections on this point are conclusory and unsubstantiated. What is arbitrary about dividing Mobile into two PMAs for analytical purposes, a Mobile East PMA where the existing Nissan dealership is located and a Mobile West PMA where Nissan was contemplating adding an additional dealership? Common sense suggests that examining brand performance in the particular area where NNA was proposing to add a dealership, and evaluating the relative performance of that area to the area in closer proximity to Nissan of Mobile, would be helpful information to consider in the dealer network analysis. Plaintiff says it is not, but does not explain why or how that renders Farhat's methodology unreliable under *Daubert*. And Nissan of

Mobile's criticism that Farhat's initial report treated the Mobile Market as a whole overlooks a key portion of Farhat's analysis which focuses in depth on the differential in performance between the two PMAs as a fundamental basis for his conclusion that the Mobile West PMA is not adequately represented by the current Nissan dealer network. (PageID.2158-60, 2175-81.) Farhat's analysis in this case always hinged on analyzing the Mobile Market as two distinct PMAs, one in which Nissan of Mobile is located and where the Nissan brand is performing in line with the applicable benchmark, and the other in which no Nissan dealership is located where Nissan brand penetration persistently falls well short of any reasonable benchmark. Plaintiff's misgivings about Farhat's methodology in this regard are not properly viewed as *Daubert* disqualifiers, but as topics for spirited cross-examination of the expert witness at trial.

> **D.** *Control for Local Market and Uneven Competitive Environments.*

Next, Nissan of Mobile faults Farhat's methodology for failing to include adequate controls for differences between the comparison market and the Mobile Market, and for failing to account for the presence or absence of competing brands in the relevant market area. Each of these points will be examined in turn.

In what is essentially a continuation of its attack on Farhat's use of the Nashville Area as a benchmark, plaintiff argues that his methodology is unreliable because he failed to account for important market conditions in the Nashville Area. Specifically, plaintiff cites the facts that the Nashville Area is home to NNA's headquarters in Franklin, Tennessee, as well as two large Nissan manufacturing plants (totaling more than 10,000 workers in Tennessee).[6] Given the uncontroversial proposition – accepted by Farhat – that Nissan employees are more likely to buy Nissan vehicles than non-Nissan employees, Nissan of Mobile posits that failure to control for such market conditions strips Farhat's methodology of *Daubert* reliability.

This argument takes an altogether cramped view of the scope of the "Nashville Area." Contrary to plaintiff's implicit assertion, the Nashville Area identified as a benchmark in Farhat's report is not narrowly circumscribed to encompass only the city of Nashville and its immediate surroundings. Rather, the "Nashville Area" is a massive geographic area embracing parts of seven states, including roughly 2/3 of Tennessee, almost all of Alabama, the Florida

---

[6] The record reflects that those two Nissan plants are located in Smyrna, Tennessee and Decherd, Tennessee. The Court takes judicial notice that both of those locations are within 100 miles of Nashville, Tennessee.

Panhandle, and bits of Mississippi, Arkansas, Kentucky and Missouri. It is not at all obvious why the failure to control for localized market conditions in and around the city of Nashville, Tennessee would invalidate the reliability of any comparisons between the "Nashville Area" and the Mobile Market for Nissan brand penetration purposes. Indeed, NNA points to record evidence that there are 841 competitive franchises within the Nashville Area (including 50 Nissan dealerships), and that the Nashville Area is also home to factories for Toyota, Honda, Hyundai, General Motors and Mercedes Benz, which would presumably give each of those brands a competitive boost as well under plaintiff's own reasoning. (PageID.2182, 2205.) On the basis of these and other considerations, the Court does not find that Farhat's methodology has been rendered unreliable for *Daubert* purposes by virtue of his failure to control for localized market conditions in and around the city of Nashville.

With respect to competing brands, plaintiff criticizes Farhat for not taking into account the presence or absence of competing dealerships in the Mobile Market versus various other markets. In his deposition, Farhat acknowledged that in areas in which there are more competitive brand dealers, Nissan would be expected to have a lower market share, all else being equal. (PageID.1128.) He likewise conceded that if, for example, a market had a Nissan dealer but no Toyota, Honda, Hyundai, Kia or Subaru dealers, Nissan would be expected to have a higher market share than if those other brands were represented by dealers in the same market. (PageID.1135.) Yet Farhat also testified that he did not make adjustments based on what brands may have been absent in other PMAs, as compared to the Mobile Market, in which all major competitors are represented by dealerships. (PageID.1130.) Plaintiff's position is that this omission by Farhat renders his methodology unreliable.

NNA's response to this argument is twofold. First, defendant points to record evidence that nearly half of the Alabama dealers that are meeting or nearly meeting the Nashville Area benchmark have significant inter-brand competition in their PMA, including almost every competing brand. Thus, the data confirms that the Nashville Area standard is reasonably achievable even in the presence of a high degree of inter-brand competition in the local area. Second, defendant essentially argues that there is no need to control for this variable because the presence of significant inter-brand competition can itself be a reason for wanting to add another Nissan dealership to a PMA to increase brand representation. As Farhat puts it, "the number of inter-brand competitors in the Mobile Metro is a primary reason for the inadequate performance

of the Nissan brand. … [A]dding a Nissan location is a reasonable response to this issue when certain other characteristics exist, including a sufficient amount of lost opportunity." (PageID.2208.) Seen through this prism, then, the degree of inter-brand competition in a PMA is not something to control for in the analysis, but an important consideration in determining whether adding another Nissan dealership may be a reasonable means of bolstering brand performance in that PMA. That plaintiff disagrees with that approach may provide fertile ground for cross-examination, but is not a basis for disqualifying Farhat's opinions altogether under the *Daubert* reliability prong.

### E. Altered Recommendation versus 2015 Market Study.

Plaintiff's next ground for seeking to disqualify Farhat's methodology as unreliable is that Farhat's market study in 2018 purportedly reached a "contradictory" conclusion from the market study performed by Farhat's company (USAI) just three years earlier. In particular, Nissan of Mobile points to the 2015 market study in which USAI analyst Dan Hopfensperger recommended that NNA monitor the Mobile Market for future Nissan representation, as opposed to creating an open point at that time. By contrast, Nissan of Mobile says, Farhat, also working for USAI and utilizing the same methodology that Hopfensperger did, reached an "open point" recommendation in 2018. Plaintiff argues that these conclusions contradict each other and that the data does not support flipping the recommendation in the manner that Farhat did, thereby undermining the reliability of his analysis. Relatedly, plaintiff bemoans the lack of an "objective standard" in Farhat's analysis for resolving the decision point of whether he would recommend an "open point" (*i.e.*, adding a new dealership) or simply a "monitored market." In his capacity as Rule 30(b)(6) deponent for USAI, Farhat unequivocally testified that there is no objective standard governing the determination of whether a monitored market or an open point should be declared. (PageID.1111.)

Neither of these criticisms warrant judicial exclusion of Farhat's expert opinions under *Daubert* gatekeeping principles. As for the alleged "inconsistency" between the Hopfensperger and Farhat recommendations, Farhat's testimony is that the distinction between a "monitored market" recommendation and an "open point" recommendation is minimal, in that both recommendations rest on data pointing to the need for additional brand representation in the Mobile Market. (PageID.2137.) Additionally, Farhat explains that his "open point" recommendation in 2018 incorporated data that was not available in 2015 when Hopfensperger

conducted his previous study, and that data continued to show the West Mobile market lagging far behind in terms of Nissan brand representation. (*Id.*) Although plaintiff posits that the new data showed overall improving Nissan brand performance in the Mobile Market, plaintiff does not disagree with the premise that the new data also reflected continuing laggard performance in West Mobile, which is precisely where the proposed Nissan dealership would be added. The Court will not disqualify Farhat's opinions simply because Nissan of Mobile reaches a different conclusion from the data than the reasonable conclusion reached by Farhat.

With respect to Nissan of Mobile's objection that Farhat lacked an "objective standard" for reaching an "open point" determination versus a "monitored market" recommendation, plaintiff points to no law or persuasive reasoning to support the proposition that such an "objective standard" is a prerequisite for any expert opinion testimony. Neither *Daubert* nor the Federal Rules of Evidence *per se* prohibit an expert from testifying simply because his conclusion is not drawn from a single objective, binary data point. To the contrary, the reliability inquiry is necessarily a flexible one. *See generally Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151-52, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (*Daubert* reliability factors "do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged," because "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable"). Here, Farhat collected and analyzed a collage of data, based on which he concluded (using his decades of experience and judgment) that creation of an "open point" in the West Mobile Market was a reasonable solution to persistent Nissan brand underperformance in West Mobile. That process and methodology contain sufficient indicia of reliability to pass muster under *Daubert*, notwithstanding the absence of a single objective criterion or thumbs-up/thumbs-down litmus test dictating his conclusion. Experts routinely testify in federal court about opinions that are not drawn from quantifiable, objective, singular data points, so long as their methods are reliable. The Court finds that Farhat's methods are indeed reliable, and overrules plaintiff's objection to the "lack of objective standards" dictating a particular conclusion to his analysis.

### F. The Beck *and* Folsom *Decisions.*

Finally, plaintiff urges the Court to adopt what it calls the "rejection of Farhat's method" by the New York Court of Appeals and the California New Motor Vehicle Board in cases styled *Beck Chevrolet Co. v. General Motors LLC*, 27 N.Y.3d 379, 384 (N.Y. 2016) and *Folsom*

*Chevrolet, Inc. v. General Motors, LLC*, Protest No. PR-2483-16 (Aug. 13, 2018). The Court has reviewed both *Beck* and *Folsom*, and finds them both to be readily distinguishable from this action. Relevant distinctions abound, but include the following: (i) neither *Beck* nor *Folsom* involved a *Daubert* challenge or the exclusion of expert testimony; (ii) *Beck* and *Folsom* were cases in which a vehicle manufacturer was terminating a dealer's franchise rights for noncompliance with a franchise agreement, whereas the case at bar relates to the significantly different question of assessing brand performance in a specific market area; (iii) the issue in *Beck* and *Folsom* was the proper market comparison for evaluating a dealer's performance, whereas the issue here is whether Nissan should reasonably add another dealer to the Mobile Market to bolster its brand penetration in that market; (iv) *Beck* and *Folsom* involved the use of a specific sales metric to evaluate a dealer's performance, as opposed to the important question in this case of the Nissan brand's effectiveness in the West Mobile PMA; (v) unlike in *Beck* and *Folsom*, Nissan of Mobile has not identified any "market challenges" unique to the Mobile Market that would render it unfair or unreasonable to use the Nashville Area as a brand performance benchmark, and Farhat has explained in detail why the use of that comparison market is reasonable under the circumstances presented here.

Simply put, the *Beck* and *Folsom* decisions concern different issues, different factual circumstances, different jurisdictions and different legal standards than those found here. Plaintiff advocates for a broad extension of certain principles enunciated in *Beck* and *Folsom*; however, at least one of those decisions itself took care to frame its holding in far narrower terms than plaintiff proposes. In *Beck*, the Court of Appeals of New York explained that its decision "should not be understood as an invitation for a court to substitute its opinion for a franchisor's determination of how best to achieve its bottom-line business goals. Decisions about how best to improve the quality of dealerships and increase dealer sales involve business judgments rightly left to franchisors, and not the courts." 27 N.Y.3d at 394. The issue in *Beck* was whether a franchisor's performance standards for its franchisees were lawful under New York state law. The issue here is very different. Plaintiff points to no judicial or administrative opinion anywhere across the country in which the *Beck* holding has been extended to exclude expert testimony as to the reasonableness of a franchisor's decision to add a new dealership to bolster

brand performance in an underperforming market area. This Court declines to be the first to make such a vast leap.[7]

## III. Conclusion.

As discussed *supra*, Nissan of Mobile has challenged the admissibility of Farhat's expert opinions in this case under the reliability prong of *Daubert*. The Court concludes that Farhat's methodology shows sufficient indicia of reliability to be admissible at trial. Most of plaintiff's critiques of his methods may be proper grounds for cross-examination, but not outright

---

[7] Relatedly, Nissan of Mobile devotes substantial attention in its *Daubert* briefs to advancing the argument that Farhat's methodology violates Alabama's Motor Vehicle Franchise Act, Ala. Code §§ 8-20-1 *et seq.* (the "MVFA"). Plaintiff cites three provisions of the MVFA as being implicated by Farhat's methodology in this case. First, plaintiff points to a provision that prohibits any "manufacturer" from coercing or attempting to coerce a motor vehicle dealer "[t]o adhere to performance standards that are not fair, reasonable, and equitable or that are not applied uniformly to other similarly situated dealers." Ala. Code § 8-20-4(1)(h). But plaintiff makes no showing that Farhat could possibly be deemed a "manufacturer" for MVFA purposes, which is a defined term meaning "[a]ny person engaged in the manufacturing or assembling of new motor vehicles as a regular business or any person who is controlled by the manufacturer." Ala. Code § 8-20-3(10). Farhat obviously is not engaged in the manufacturing or assembling of new motor vehicles as a regular business; moreover, this record lacks any factual basis for concluding that he is "controlled" by NNA. Besides, Nissan of Mobile fails to show how anything in Farhat's report could be deemed "coercion" within the meaning of the Act, or how his analysis of Nissan brand performance in the Mobile Market has anything to do with a "performance standard" for a dealership. Critically, Farhat has offered no opinions in this case that Nissan of Mobile's performance has been inadequate, that it has failed to comply with sales metrics or other performance standards, or that its performance was somehow violative of the dealer agreement. As such, plaintiff's insistence that Farhat's methods violate the MVFA is difficult to fathom. Second, plaintiff cites the section of the MVFA prohibiting a manufacturer from engaging "in any action with respect to a franchise which is arbitrary, unconscionable, unreasonable, or is not in good faith and which causes damage to any of the parties." Ala. Code § 8-20-4(2). Again, Farhat is not a manufacturer. Even if he were, for the reasons stated *supra*, the Court does not find that that he has taken any action with respect to Nissan of Mobile that is "arbitrary, unconscionable, unreasonable, or is not in good faith." Even if he had, the Court also does not find that his methodology has "cause[d] damage" to plaintiff. NNA decided to add a new dealership to the Mobile Market before it ever retained Farhat in this litigation. Therefore, plaintiff's theory that Farhat violated § 8-20-4(2) is misplaced. Third, Nissan of Mobile cites the portion of the MVFA stating that "[e]very dealer agreement … shall impose on the parties the obligation to act in good faith and to deal fairly." Ala. Code § 8-20-4.1. Of course, Farhat is not a party to the dealer agreement between NNA and Nissan of Mobile. Even if he were, the Court does not find on this record that his methodology in performing his analysis in this case lacks "good faith" or fair dealing. For all of these reasons, plaintiff's contention that Farhat's methodology violates Alabama law is unpersuasive.

exclusion. In many respects, plaintiff's Motion appears to boil down to a contention that Farhat's conclusions are wrong and therefore should not be heard at trial. But that is not how it works. "Once an expert opinion has satisfied *Daubert*, a court may not exclude the opinion simply because it believes that the opinion is not – in its view – particularly strong or persuasive." *Seamon*, 813 F.3d at 990. For all of these reasons, plaintiff's Motion to Exclude Expert Testimony of Sharif Farhat (doc. 96) is **denied**.

DONE and ORDERED this 16th day of October, 2019.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE