**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **GPI-AL, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **CIVIL ACTION 17-0511-WS-MU** |
| | ) |
| **NISSAN NORTH AMERICA, INC.,** | ) |
| | ) |
| **Defendant.** | ) |

**ORDER**

This matter comes before the Court on the Motion for Summary Judgment (doc. 110) filed by plaintiff, GPI AL-N, Inc., and the Motion for Partial Summary Judgment (doc. 111) filed by defendant, Nissan North America, Inc. Both Motions have been extensively briefed and are now ripe for disposition.

**I.  Nature of the Case.**

Plaintiff, GPI AL-N, Inc. d/b/a Nissan of Mobile ("Nissan of Mobile"), is an independently owned motor vehicle dealer that operates an authorized Nissan dealership in Mobile, Alabama. Nissan of Mobile brought this action against defendant, Nissan North America, Inc. ("NNA"), a manufacturer/distributor of new Nissan motor vehicles, after NNA announced its intention to create a so-called "open point" to establish a new Nissan dealership in west Mobile, Alabama. According to Nissan of Mobile, NNA's actions violate both the terms of the Dealer Agreement governing the parties' relationship and the statutory provisions of the Alabama Motor Vehicle Franchise Act, Ala. Code §§ 8-20-1 *et seq.* (the "MVFA").

In its Amended and Restated Complaint (doc. 46), Nissan of Mobile asserts a half-dozen state-law causes of action against NNA, including four claims for alleged violations of the MVFA and two claims for breach of contract.[1] Specifically, Count One alleges a violation of § 8-20-4(3)(*l*) because NNA's decision to establish an additional dealership in Mobile was

---

[1]    Federal subject-matter jurisdiction is properly predicated on the diversity provisions of 28 U.S.C. § 1332, inasmuch as there is complete diversity of citizenship between the parties and the amount in controversy well exceeds the $75,000 threshold.

unreasonable under the circumstances, thereby entitling Nissan of Mobile to an injunction barring NNA from entering into the proposed franchise. Count Two is also an MVFA claim, in which Nissan of Mobile alleges that NNA violated § 8-20-4(1)(h) by coercing plaintiff to adhere to sales performance standards that are not fair, reasonable or equitable, such that Nissan of Mobile is entitled to an injunction barring NNA from violating the MVFA. In Count Three, plaintiff invokes § 8-20-4(2), alleging that NNA engaged in arbitrary, unconscionable, unreasonable or bad-faith action by failing to follow the Dealer Agreement in creating a new dealership, failing to allow Nissan of Mobile to object to the market study, failing to consider those objections, considering factors other than the Mobile market's need for an additional Nissan dealer, and evaluating Nissan of Mobile's performance using a standard that fails to take into account relevant factors. On that basis, Nissan of Mobile seeks an injunction in Count Three prohibiting NNA from creating an open point or appointing any new dealer in Mobile. Count Four, the final MVFA claim, alleges that NNA violated the duty imposed by § 8-20-4.1 to act in good faith and deal fairly by failing to abide by the terms of the Dealer Agreement, failing to follow its own internal procedures in evaluating whether to add another dealer, failing to follow internal procedures regarding the integrity of the market study, rejecting the "monitored market" recommendation of its consultant, and basing its decision to add another dealer upon irrelevant factors. Plaintiff seeks an injunction in Count Four prohibiting NNA from creating an open point or appointing any new dealer in Mobile.

Counts Five and Six of the Amended Complaint sound in theories of breach of contract. In Count Five, plaintiff maintains that NNA breached the Dealer Agreement by deciding to add another dealer to the Mobile market before notifying Nissan of Mobile of the results of the market study, failing to provide Nissan of Mobile with an opportunity to object to the study, and giving no consideration to Nissan of Mobile's objections, for which plaintiff seeks an injunction prohibiting NNA from creating an open point or appointing a new dealer in west Mobile. Meanwhile, in Count Six, plaintiff alleges that NNA breached the Dealer Agreement by failing to endeavor to discern if there were reasonable criteria that should be taken into account in analyzing Nissan of Mobile's sales performance, and that Nissan of Mobile is therefore entitled to an injunction prohibiting NNA from evaluating Nissan of Mobile's sales performance using metrics that fail to take into account "reasonable criteria directly affecting Nissan of Mobile's sales opportunity and performance." (PageID.280.)

The parties have filed and briefed multipronged, overlapping cross-motions for summary judgment. Plaintiff contends that it is entitled to judgment as a matter of law on each of the six causes of action joined in the Amended Complaint. For its part, defendant seeks entry of summary judgment in its favor on Counts Two through Six, while representing that genuine issues of material fact remain as to Count One.

## II.  Relevant Background Facts.[2]

### A.  *The Dealer Agreement.*

Nissan of Mobile and NNA entered into a Dealer Sales & Service Agreement (the "Agreement") on November 28, 2011. (PageID.1304.) The parties subsequently amended and extended that Agreement on December 20, 2016. (PageID.1306-07.) Incorporated into the terms of that Agreement is a document styled "Nissan Dealer Sales and Service Agreement Standard Provisions" (the "Standard Provisions"). (PageID.1586.) Section 3.B. of the Standard Provisions states that "Dealer's performance of its sales responsibility for Nissan Cars and Nissan Trucks will be evaluated by Seller on the basis of such reasonable criteria as Seller may develop from time to time," and provides certain examples of such "reasonable criteria." (PageID.1310.) Among those enumerated types of "reasonable criteria" for evaluating dealer sales performance recited in the Standard Provisions is Section 3.B.3, which allows for "[a] comparison of Dealer's sales and/or registrations to sales and/or registrations of all other Authorized Nissan Dealers combined in Seller's Sales Region and District in which Dealer is located." (*Id.*) Section 3.D. of the Standard Provisions states that "[w]here appropriate in

---

[2]     The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Smith v. LePage*, 834 F.3d 1285, 1296 (11th Cir. 2016) ("It is not this Court's function to weigh the facts and decide the truth of the matter at summary judgment …. Instead, where there are varying accounts of what happened, the proper standard requires us to adopt the account most favorable to the non-movants.") (citations and internal quotation marks omitted). As to each cross-motion for summary judgment, then, the record will be viewed in the light most favorable to the non-movant, with all justifiable inferences drawn in the non-movant's favor. Also, federal courts cannot weigh credibility at the summary judgment stage. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices."). Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept[s] [each non-movant]'s version of the facts drawing all justifiable inferences in [each non-movant]'s favor." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

evaluating Dealer's sales performance, Seller will take into account such reasonable criteria as Seller may determine from time to time, including, for example," things like dealership location, general shopping habits of the public in that market area, any special local market conditions that would affect the dealer's sales performance differently than other dealers, and the like. (PageID.1310-11.)

Section 4 of the Standard Provisions addresses issues concerning market studies, NNA's authority to establish an "open point" (*i.e.*, to create a new dealership in a particular market), and Nissan of Mobile's rights to be notified and to object in certain circumstances under certain conditions. In particular, Section 4.A. provides, in pertinent part, that "Seller may, from time to time and in its sole discretion, conduct studies of various geographic areas to evaluate market conditions. … Such studies will make recommendations concerning the market, the Dealership Facilities, and the Dealership Location." (PageID.1311.) Section 4.B.1. establishes the following procedures regarding creation of an open point:

> "If any study conducted pursuant to Section 4.A recommends that an open point be established at a location that is within ten (10) miles driving distance … of Dealer's main Dealership Location, Seller will so notify Dealer. Dealer will have thirty (30) days from Dealer's receipt of notice of the recommendations of the study in which to object to them. Upon Dealer's request, Seller will review the results of the study with Dealer …. Seller will consider all objections to the recommended open point timely made by Dealer."

(PageID.1312.) And Section 17.A. of the Standard Provisions provides as follows: "All notices or notifications required or permitted to be given by this Agreement to either party shall be sufficient only if given in writing and delivered personally or by mail to the Dealer at the address set forth on the Dealership Facilities Addendum … and to Seller at its national headquarters." (PageID.1313.)

### B.    The 2015-2016 Market Study.

On October 2, 2015, NNA transmitted a letter to Nissan of Mobile to notify it that, pursuant to § 4.A. of the Standard Provisions, NNA "will conduct a market study in the Gulf Coast area." (PageID.1621.) The October 2 letter invited Nissan of Mobile to submit any information it wished to bring to NNA's attention within 30 days, and indicated that NNA would consider such information prior to finalizing a recommendation. (*Id.*) Nissan of Mobile elected not to avail itself of this opportunity. (PageID.1625-26, 1632.)

NNA retained a company called Urban Science Applications, Inc. ("USAI") to prepare the Mobile market study. USAI delivered its completed report for the Mobile market to NNA on January 4, 2016. (PageID.1344-45.) The initial result of that study was that USAI recommended a "monitored market," meaning that NNA would monitor the Mobile market going forward to continue evaluating whether establishing an open point at some future time would be appropriate. (PageID.1372.)[3] Although various NNA officials and departments signed off on that recommendation, Andy Delbrueck, who was NNA's Senior Manager of Market Studies, harbored lingering concerns with the "monitored market" recommendation and halted the approval process to conduct further investigation. (PageID.1359-60.)[4] It was Delbrueck's role in the company to suspend the approval process when issues arose. (PageID.1372.) Delbrueck's concerns were shared by Billy Hayes, who was NNA's Regional Vice President for the Southeast Region. (PageID.1363, 1366-67.) As a result of NNA's decision to table the market study and conduct further investigation, no presentation of the USAI study or its "monitored market" recommendation was made to Nissan of Mobile in early 2016.

### C. The Decision to Create a West Mobile Open Point.

In furtherance of the information-gathering process, Delbrueck traveled to Mobile in late 2016 for the purpose of "tak[ing] a look at the Mobile market … as a result of Urban Science presenting the study to [NNA]." (PageID.1481.) At that time, he "drove the Mobile market" over the course of "more than a couple of hours," including driving the "existing auto row in Mobile" where Nissan of Mobile is located, as well as the auto row in West Mobile.

---

[3] Indeed, USAI's "Dealer Network Analysis Executive Presentation" for the Mobile market presented in January 2016 included the following specific recommendation: "Monitored Market: Nissan Division should perpetuate Mobile West as a monitored market for possible future representation." (PageID.1457.)

[4] Delbrueck testified that "[w]e don't adopt all Urban Science recommendations," and that on multiple occasions NNA has overridden a USAI recommendation for a monitored market in favor of establishing an open point. (PageID.1486.) In the case of the Mobile market, Delbrueck's reservations centered on "operational things," such as the Nissan brand's history of poor performance in that market, and the investments that several other brands (including market leaders) had made in new facilities in west Mobile. (*Id.*) As Delbrueck put it, "Everything pointed to us … that this is … a viable add point based on all the information that we were getting. So … that's when at the point we decided to – let's just table this for now, go out and take a look at it ourselves – because we don't take these recommendations lightly – and then see if indeed we would adopt this recommendation or not." (*Id.*)

(PageID.1481, 1483.)  In canvassing the West Mobile area, Delbrueck drove "past each one of the dealerships that were established there," drove "north and south of the auto row, … back into some areas where there [were] new houses being constructed," traveled "past the big box retailers just to gauge an indication of who was there," and "drove around each one of the dealerships that was there; the Ford, the Chevy, the Toyota, and the Hyundai."  (PageID.1484.)  In driving the market, Delbrueck was looking for indications of the kind of retail in the area, whether the area was growing or declining, whether there was investment in new facilities (either inside or outside the automotive industry), and the like.  (PageID.1485.)

Ultimately, in February 2017, "there was a change made in the recommendation for the open point because we did not agree with Urban Science on their initial assessment." (PageID.1493.)  NNA's evidence is "that's not an unusual occurrence.  We don't always agree with Urban Science on their findings."  (PageID.1494.)  As one NNA official explained, "In the case of this particular situation, our existing dealer was not covering that part of the market … to what we consider to be an adequate level, and that was why the decision was made to then change it to an open point. … So that's really the difference between open point and monitored market.  If we're not covering the area and capturing the opportunity that's there, then obviously that has an impact on the final decision on whether or not we declare an open point."  (*Id.*)  After the recommendation of the market study was changed to establishment of an open point, various NNA officials and departments signed off on the new recommendation in short order. According to NNA, the "final decision from Nissan to move forward with creating an open point in Mobile West" was made before NNA presented the market study results to Nissan of Mobile. (PageID.1495.)[5]

---

[5]        Although plaintiff places enormous weight on this fragment of testimony from the deposition of NNA official Toby Perry, there is some uncertainty as to what exactly the witness meant when he answered, "That's correct," in response to a question from plaintiff's counsel phrased as quoted *supra*.  Perry went on to explain that the next step after "this finalizes the process" was to notify the dealer of the study results.  (*Id.*)  Per NNA's internal procedures, after all internal approvals of an open point recommendation are made (*i.e.*, after that internal process is "finalized"), NNA "reviews those market study results and recommendations" with the dealer. (PageID.1402.)  A letter sent by NNA to Nissan of Mobile characterized the market study as simply making a "recommendation" that an open point be created.  There is thus ambiguity in the record as to whether NNA had made a final, irrevocable determination that an open point would be created, or whether it had simply finalized the internal process, so as to warrant moving

A "Dealer Presentation" was prepared and dated February 2017.  It essentially retained all or most of the data and analysis from the original market analysis report prepared by USAI in January 2016, but modified the final conclusion to recommend an open point in the West Mobile market.  (PageID.1497-1522.)[6]

On March 15, 2017, NNA's Dealer Operations Manager, Ryan Knight, met with Michael Neves, Nissan of Mobile's General Manager, in person to review the market study.  (PageID.1526.)  At that time, Knight informed Neves that "it has been decided that another store will be added in West Mobile, ideally within a relative location to Palmer's Toyota and Palmer's Hyundai."  (*Id.*)  For his part, "Neves acknowledged the findings and did not have any further comment on the topic."  (*Id.*)  On the same date, Knight presented this information to David Fesmire, who was listed as the "dealer" on the Dealer Agreement, via telephone.  In response, Fesmire "voiced his concern about the number of new stores going in around the gulf area in general, but understands Nissan's drive to match Toyota's locations and to get ahead of potential growth."  *Id.*  On March 30, 2017, NNA sent a letter to Fesmire formally notifying Nissan of Mobile of the results of the market study, indicating that the study yielded a "recommendation" of establishing an open point in West Mobile, and concluding, "Thank you again for the opportunity to meet with you to review the study results."  (PageID.1685.)  On April 18, 2017, Nissan of Mobile met with NNA officials and stated their position that (i) "the market was still properly served with the 1 location," (ii) designating the open point was premature, (iii) the data supporting the market study was of questionable relevance because it dated back to October 2015 "and may not reflect the current market conditions," and (iv) Nissan of Mobile's parent company "might be interested in establishing a service location in this area."  (PageID.1406.)  At the

---

on to present the recommendation to the dealer with full recognition of the dealer's attendant procedural protections and safeguards (such as the opportunity to object) provided by the Dealer Agreement.

[6]     As revised, the recommendation for West Mobile stated as follows: "Open Point: Nissan Division should establish exclusive, standalone Nissan sales, service and parts facilities which meet or exceed all established Nissan Division guidelines and/or future operational requirements, comply with the Nissan Retail Environmental Design Initiative and be competitive with facing dealership facilities in the assigned PMA. The recommended location for Nissan representation is in the immediate vicinity of Palmer's Airport Toyota."  (PageID.1517.)

conclusion of the meeting, NNA advised Nissan of Mobile that "Nissan would be moving forward with the Open Point." (*Id.*)  This litigation followed.

## III.    Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

Here, both sides have moved for summary judgment on the claims asserted in this action. It is well-settled that "[t]he applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment."  *Page v. Winn-Dixie Montgomery, Inc.*, 702 F. Supp.2d 1334, 1345 (S.D. Ala. 2010) (citations omitted); *see also Murray v. Holiday Isle, LLC*, 620 F. Supp.2d 1302, 1307 (S.D. Ala. 2009) (same).  The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed."  *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (citation omitted); *see also Wermager v. Cormorant Tp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983) ("the filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the

merits"). Nonetheless, "cross-motions may be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the dispositive legal theories and material facts." *Page*, 702 F. Supp.2d at 1345 (citations omitted); *see also Murray*, 620 F. Supp.2d at 1307.

## IV. Analysis.

As noted, the parties have filed and briefed cross-motions for summary judgment. In its Rule 56 Motion, Nissan of Mobile seeks entry of judgment in its favor as to all six causes of action asserted in the Amended Complaint. By contrast, NNA's Motion for Summary Judgment seeks dismissal of only Counts Two through Six, without requesting entry of judgment as a matter of law as to Count One of the Amended Complaint. The parties' respective arguments on each cause of action will be addressed sequentially.

### A. Violation of Alabama Code § 8-20-4(3)(l) (Count One).

As noted, only plaintiff has moved for summary judgment on Count One, which is a statutory claim arising under Alabama's Motor Vehicle Franchise Act. Count One alleges that NNA violated the subsection of the MVFA prohibiting a manufacturer from "unreasonably and without notice to existing motor vehicle dealers … enter[ing] into a franchise with an additional motor vehicle dealer who intends to conduct its dealership operations from a place of business situated within the relevant market area of an existing motor vehicle dealer … representing the same line make." Ala. Code § 8-20-4(3)(*l*). Reasonableness is the touchstone of the inquiry under § 8-20-4(3)(*l*). In a legal proceeding to determine whether such a proposed appointment is reasonable, the manufacturer "shall have the burden of proof that such action is not unreasonable." *Id.* "In determining whether such a proposed appointment is unreasonable, the court shall consider all pertinent circumstances." *Id.*[7]

---

[7] A non-exhaustive list of the circumstances that may properly be considered in that inquiry includes the following: "(1) Whether the establishment of such additional franchise is warranted by economic and marketing conditions including anticipated future changes. (2) The past, present, and anticipated retail sales and service business transacted by the objecting motor vehicle dealer …. (3) The investment made and obligations incurred by the objecting motor vehicle dealer …. (4) Whether it is beneficial or injurious to the public welfare for an additional franchise to be established." Ala. Code § 8-20-4(3)(*l*)(1)-(4).

To meet its burden of showing that its decision to create an open point for the West Mobile market was not unreasonable, NNA relies heavily on the expert opinions of Sharif Farhat, Vice President of Expert Analytical Services for USAI, whom NNA retained to perform a market analysis after Nissan of Mobile filed suit.[8] Among the conclusions of Farhat's report were the following: (i) the Mobile West Primary Market Area ("PMA")[9] has experienced subpar Nissan brand performance (measured by registration effectiveness) since at least 2012, whereas the PMA served by Nissan of Mobile essentially met or slightly exceeded the standard in 2017 and 2018; (ii) using various standards and metrics of comparison, the data consistently shows that the Mobile West PMA "is not being adequately represented by the current Nissan dealer network;" (iii) Nissan of Mobile's sales performance in the Mobile Metro (as measured by a metric called State Sales Effectiveness Represented, or SSER) was below average during the analyzed period, but stood to increase to above average if a dealer were appointed in West Mobile, thereby shrinking Nissan of Mobile's PMA; (iv) the growth of Nissan vehicles available within the market in West Mobile was consistently falling short of that in the east side serviced by Nissan of Mobile; (v) population, median income and employed population were all growing in the Mobile West PMA and were projected to continue growing; (vi) based on competitive dealer counts, Nissan needed additional dealer representation in the Mobile Metro area to reach its benchmark standard; and (vii) other brands offered superior levels of customer convenience in the Mobile West PMA as compared to the existing Nissan dealer network. (PageID.1977-80.) Based on these and other factors, data points and analyses, Farhat concluded that "the primary cause of the deficient market penetration (*e.g.*, inadequate representation) of the Nissan brand is that there are too few Nissan sales and service facilities available in the Mobile Metro …, which

---

[8]     To be clear, Farhat's report is <u>not</u> the USAI market study that gave rise to the "open point" recommendation in early 2017. Rather, Farhat's expert report was prepared after the fact, during the lifespan of this litigation, as evidence of the reasonableness of NNA's "open point" determination.

[9]     "PMA" is a technical term that Farhat explained as follows: "Each Nissan dealer has a geographically assigned Primary Market Area ('PMA'). … [A] Nissan dealer's PMA exists because it is the area in which the dealer enjoys a competitive advantage over all other Nissan dealers due to geographic factors. … Absent natural or man-made barriers, unusual traffic patterns or shopping habits that indicate otherwise, a PMA is the contiguous set of census tracts closest and most convenient to the Nissan dealer in that PMA." (PageID.1972-73.)

has resulted in too few registrations in relation to the opportunity available. This can be solved by adding another Nissan dealer in the Mobile Metro." (PageID.1980.)

On its face, Farhat's expert report is sufficient to create genuine issues of material fact as to whether NNA can meet at its burden under § 8-20-4(3)(*l*) to show that its decision to establish an open point in the Mobile West PMA was not unreasonable. Plaintiff does not argue otherwise; rather, plaintiff's position is that Farhat's expert opinions should be excluded in their entirety under *Daubert* reliability principles. If NNA's expert in automotive dealer market analysis were excluded, Nissan of Mobile reasons, NNA could not meet its statutory burden of showing reasonableness, and plaintiff would therefore be entitled to summary judgment on Count One. Indeed, Nissan of Mobile candidly acknowledges that "summary judgment as to Count One rests on the admissibility of Farhat's opinions." (PageID.2428.)[10] By separate Order entered on this date, however, the undersigned has denied plaintiff's Motion to Exclude Expert Testimony of Sharif Farhat (doc. 96). Because the Court has deemed Farhat's expert opinions admissible at trial, plaintiff's motion for summary judgment as to Count One (which was grounded solely in the notion that Farhat's opinions were inadmissible under *Daubert*) is properly **denied**.

### B.      *Violation of Alabama Code § 8-20-4(1)(h) (Count Two).*

Both sides move for summary judgment on Count Two. In that claim, Nissan of Mobile maintains that NNA violated the MVFA provision prohibiting it from "coerc[ing] or attempt[ing] to coerce any motor vehicle dealer to … adhere to performance standards that are not fair, reasonable, and equitable or that are not applied uniformly to other similarly situated dealers." Ala. Code § 8-20-4(1)(h). That subsection further requires that any such performance standard "that may have a material effect on a dealer" must be fair, reasonable, and equitable. *Id.* Plaintiff's position is that NNA's use of a performance metric called "State Sales Effectiveness Represented," or "SSER" for short, violates § 8-20-4(1)(h) because it fails to account for local market conditions, such as the presence or absence of competing dealers or the presence or

---

[10]      Elsewhere in briefing its summary judgment motion, plaintiff reiterates the point, stating, "Without the testimony of Farhat, or the methodology used by him, NNA has no basis to establish that the conditions in the Mobile market justify an additional dealer." (PageID.1298.)

absence of Nissan facilities and employees.[11]  Plaintiff's evidence is that NNA utilizes SSER as "measurement of a dealer's opportunity for growth relative to other dealers within that state." (PageID.1320.)

As a threshold matter, NNA argues that Count Two fails as a matter of law because Nissan of Mobile lacks standing to bring a claim under § 8-20-4(1)(h).  The MVFA creates a private right of action for "any person **who is injured in his business or property** by a violation of this chapter by the commission of any unfair and deceptive trade practices, or because he refuses to accede to a proposal for an arrangement which, if consummated, would be in violation of this chapter."  Ala. Code § 8-20-11 (emphasis added); *see also DaimlerChrysler Motors Corp. v. Susan Schein Chrysler, Plymouth, Dodge, Inc.*, 853 So.2d 925, 927 (Ala. 2003) (confirming that relief is available under § 8-20-11 only for a person "who is injured in his business or property by a violation of this chapter" and that a plaintiff may not recover for "a future injury that never materialized").  NNA's point, quite simply, is that the record is devoid of evidence that Nissan of Mobile has been injured in its business or property by NNA's use of the SSER performance metric (*i.e.*, the alleged unfair and deceptive trade practice at the heart of Count Two).  Defendant's evidence is that the SSER was one of myriad forms of data considered in NNA's decision to establish an open point in West Mobile, and that it was neither the only nor

---

[11]	The SSER is calculated as follows: For a particular time period, one adds the total number of Nissan vehicles registered in all markets in the state in which Nissan has a dealership. That number is divided by the total number of competitive registrations in that same area and time frame to calculate the state market share.  (PageID.1392-93.)  This state market share figure is then multiplied by total number of competitive registrations in Nissan of Mobile's PMA to generate an "expected" number of sales.  Nissan of Mobile's total sales divided by the "expected" sales equals the SSER, after an adjustment is made for vehicle segments. (PageID.1393.)  For example, if Nissan's state market share was 20% and if there were 1,000 competitive registrations in Nissan of Mobile's PMA during a specific time period, then Nissan of Mobile's "expected" number of sales would be 200.  If Nissan of Mobile actually sold 220 vehicles during that time period, then (after adjusting for vehicle segments) its SSER would be calculated as 220/200, or 110%.  Simply put, Nissan of Mobile's objection to SSER is that it fails to account for local market conditions such as how many competitors are in the local market or the demographic characteristics of that market.  Nissan of Mobile argues that the omission of these factors from SSER computation renders that performance standard unfair, unreasonable and inequitable, so as to be violative of § 8-20-4(1)(h).

even the primary metric in that calculation.[12]  Defendant also points out that Nissan of Mobile

has disclaimed any intent to bring claims for damages in this action based on NNA's use of the

SSER in dealer incentive programs.  (PageID.2288, 2329.)  And while NNA acknowledges using

the SSER standard in granting or denying executive manager approvals, Nissan of Mobile cannot

identify a single candidate who was rejected based on such a criterion and does not purport to

seek damages on that basis.  (PageID.2283, 2287.)

    Faced with this substantial record showing that it has not incurred injury its property or

business by NNA's use of the SSER performance standard, plaintiff counters with a factual

argument and a legal argument.  The factual argument is that Nissan of Mobile has indeed been

injured in its business or property by NNA's reliance on SSER scores.  Indeed, plaintiff's brief

posits, "It is clear that SSER was a driving factor in NNA's decision to declare an open point."

(PageID.1892.)  The trouble is that plaintiff identifies no record evidence that reasonably

supports that proposition.  Plaintiff cites no deposition testimony, exhibit or discovery response

in which any representative of NNA ever indicated that the decision to declare an open point in

West Mobile was driven by deficiencies in Nissan of Mobile's SSER score.  At most, Nissan of

Mobile offers deposition testimony showing that NNA witnesses referred generally to having

conducted a "sales analysis" (as opposed to a "service analysis") in the open point decision,

which was based in part on "years of inadequate representation in Mobile."  But these kinds of

statements are too generic, too vague, and too open-ended to support a reasonable inference that

NNA decided to create an open point because Nissan of Mobile's SSER score was too low, or

indeed that its SSER score had any material influence on that decision.[13]  Nothing in this

_____

    [12]    As evidence of this fact, NNA refers to the 26-page "Dealer Presentation" dated
February 2017, documenting its market study and proposal to establish an open point.
(PageID.1643-68.)  Only a single page of that Dealer Presentation made reference to SSER
scores, with the remainder of the document focusing on data points such as demographic patterns
(including population and income growth), registration trends, location and identity of key
competitive dealerships, units in operation, competitive registration density, and so on.
Defendant also identifies evidence that in explaining the "open point" decision to Nissan of
Mobile, NNA did not rely on SSER.  (PageID.1672.)

    [13]    More broadly, Nissan of Mobile's argument conflates two analytically distinct
concepts.  The issue of whether a dealer's sales performance is good or bad is not the same as
whether Nissan's representation in the Mobile market is adequate or inadequate.  Adequate
dealer sales performance and inadequate brand representation in a given market can coexist,

evidence cited by plaintiff gives rise to a genuine issue of material fact as to whether NNA's use of a SSER performance metric was a "driving factor" in the open point decision. There is simply no showing of causation between the SSER standard and the open point determination. As such, on this record, plaintiff has not shown that it has been damaged in its property or business by virtue of an allegedly unfair performance standard (*i.e.,* the SSER) being used against it in the open point analysis.[14] Plaintiff's argument that there are disputes of fact as to whether it was harmed by defendant's use of the SSER performance standard is unavailing.

Nissan of Mobile's legal argument that defendant has omitted "a key provision of the statute" fares no better. In particular, plaintiff focuses on statutory text conferring a private right of action on any person injured in his business or property "because he refuses to accede to a proposal for an arrangement which, if consummated, would be in violation of this chapter." Ala. Code § 8-20-11. Plaintiff also cites a concurring opinion from an Alabama Supreme Court case

---

depending on the relevant market factors. Defendant's evidence demonstrates that the decision of whether to create an open point rests on the adequacy or inadequacy of brand representation in a given market (based on all relevant market factors, such as registration trends, demographic trends, and competitor activities and locations), not on an evaluation of whether a particular dealer is excelling at the SSER metric. Thus, as defendant puts it, Nissan of Mobile's "performance is only tangentially related to the question of whether additional representation is needed in the West Mobile Open Point." (PageID.1946.) Plaintiff's argument blurs this clear distinction.

[14] Separate and apart from its contention that use of the SSER injured it as to the "open point" decision, Nissan of Mobile maintains that it has also been harmed because (i) "NNA uses SSER in setting incentive goals through its Sales Growth Program," (ii) "NNA requires dealerships to have an executive manager …, but illegally conditions approval of the candidate on the dealership … having at least 100% SSER;" and (iii) "NNA has coerced Nissan of Mobile to purchase more vehicles at wholesale … to correct Nissan of Mobile's alleged SSER deficiencies." (PageID.1893.) As to the Sales Growth Program, however, plaintiff offers no evidence and no allegations that its incentive bonuses were reduced or impaired by virtue of the SSER metric, and does not dispute NNA's evidence that plaintiff has disclaimed any intent to bring a damages claim based on an incentive program. As to the approval of executive manager candidates, plaintiff has been unable to identify a single instance in which approval was withheld for a Nissan of Mobile executive manager based on SSER scores. And as to inventory, plaintiff offers no explanation or evidence that it was harmed in any manner by a requirement that it purchase additional vehicles at wholesale because of low SSER scores. The bottom line is this: Nissan of Mobile has not shown that it was injured in its business or property in any of these respects through NNA's utilization of the purportedly unfair SSER performance standard.

that it says confirms that prospective future violations of the MVFA are actionable.[15]  On that basis, Nissan of Mobile's position is that it need not show injury in order to pursue relief under § 8-20-11.

This argument is unpersuasive because the cited statutory language has no apparent application to the circumstances here.  This case is not about a proposed illegal arrangement at all.  SSER is not a brand-new policy or initiative that NNA is attempting to roll out at this time over a dealer's objection; rather, as Nissan of Mobile admits and as the summary judgment record confirms, "NNA adopted SSER as its primary standard in 2014." (PageID.1886.)  It is thus undisputed that NNA has been evaluating Nissan of Mobile's sales performance using the SSER metric for more than five years.[16]  Under any reasonable construction of the statute, this is not a "proposal for an arrangement" within the meaning of § 8-20-11; indeed, there is not even any evidence in the record as to whether NNA intends to continue utilizing SSER as a performance standard for Nissan of Mobile on a going-forward basis.  Moreover, the record lacks any indication that Nissan of Mobile said or did anything to "refuse[] to accede" to any such proposal, if it existed.  And even if plaintiff could point to evidence that NNA made a "proposal for an arrangement" to which Nissan of Mobile "refuse[d] to accede," the statute still requires a showing that plaintiff was injured <u>because of</u> that refusal.[17]  Plaintiff identifies nothing

---

[15]      In that concurrence, Justice Johnstone construed § 8-20-11 as "contemplat[ing]" proposed illegal arrangements which are not consummated but are, rather, stopped by the litigation."  *DaimlerChrysler*, 853 So.3d at 928 (Johnstone, J., concurring).

[16]      In summary judgment briefing, Nissan of Mobile insists that it "has been forced to file this action in order to prevent NNA's proposed illegal course of action," namely the creation of another dealership at the open point in West Mobile.  (PageID.1903.)  But plaintiff's argument mixes apples and oranges.  The purported "violation" of the MVFA that animates Count Two is not NNA's proposal to appoint another dealer to fill the open point, or even the decision to declare an open point at all; rather, the "violation" at issue in Count Two is NNA's use of the SSER as a performance standard.  That is not a "proposed illegal course of action" at all, but is rather an evaluation methodology that, by plaintiff's own admission, NNA has already been utilizing for years.  Plaintiff's argument seeks to force a square peg into a round hole.

[17]      Again, on its face, the MVFA allows a civil action to be brought by "any person who is injured in his business or property … because he refuses to accede to a proposal for an arrangement which, if consummated, would be in violation" of the Act. Ala. Code § 8-20-11. Such language plainly requires a causal connection between a plaintiff's refusal to accede to an

in the summary judgment record that would support a reasonable inference of any such injury. In short, then, plaintiff's argument that it is entitled to proceed with Count Two pursuant to the "refuses to accede to a proposal" language in § 8-20-11 is unconvincing.[18]

To summarize, Count Two is a claim that NNA violated the MVFA by coercing or attempting to coerce Nissan of Mobile to adhere to sales performance standards (namely, the SSER) that were unfair, unreasonable and inequitable. In order for Nissan of Mobile to be eligible to assert this claim, the MVFA requires that it be "injured in [its] business or property by a violation of this chapter by the commission of any unfair and deceptive trade practices, or because [it] refuses to accede to a proposal for an arrangement which, if consummated, would be in violation of this chapter." Ala. Code § 8-20-11. The summary judgment record lacks evidence that Nissan of Mobile was injured in its business or property by NNA's use of the SSER performance standard. There are no record facts that plaintiff's SSER scores were a driving force behind the "open point" decision, that they were used to penalize plaintiff in any sales incentive program, that they were a basis for disapproval of any executive manager candidate, or the like. In the absence of proof of injury to its business or property caused by NNA's reliance on the SSER performance standard, Nissan of Mobile cannot proceed as to Count Two. Its attempt to invoke the "accede to a proposal" statutory language is unavailing for multiple reasons, including, notably, that NNA has been using the SSER to evaluate Nissan of Mobile's sales performance for five years, so there is no "proposal" in play here. For all of these reasons, defendant's Motion for Summary Judgment is due to be **granted** as to Count Two, and plaintiff's corresponding Motion for Summary Judgment is due to be **denied** as to Count Two.

_____

illegal proposal and the injury to the plaintiff's business or property. Plaintiff has come forward with zero evidence of such a causal nexus.

[18]     The same is true of plaintiff's emphasis on statutory text that the MVFA is violated when a manufacturer "attempts to coerce" a dealer to adhere to unfair performance standards. (PageID.2426.) To be sure, § 8-20-4(1)(h) does include the referenced "attempts to coerce" language; however, plaintiff does not explain how it contends the record supports a reasonable inference that NNA attempted to coerce Nissan of Mobile to adhere to SSER. Even if plaintiff had made such a showing, the existence of a violation of § 8-20-4(1)(h) does not give rise to a viable cause of action unless the requirements of § 8-20-11 are satisfied. For the reasons stated _supra_, the Court finds that the record does not support a reasonable inference that they are or can be satisfied at trial.

### C.     Violation of Alabama Code § 8-20-4(2) (Count Three).

Both parties have moved for summary judgment on Count Three, another statutory claim brought under the MVFA.  Specifically, Count Three alleges that NNA violated the statutory prohibition against any manufacturer "engag[ing] in any action with respect to a franchise which is arbitrary, unconscionable, unreasonable, or is not in good faith and which causes damage to any of the parties."  Ala. Code § 8-20-4(2).  Plaintiff contends that defendant ran afoul of § 8-20-4(2) in a multitude of ways, including (i) failure to follow the Dealer Agreement in creating an open point; (ii) failure to allow Nissan of Mobile to object to the market study's recommendations or to consider Nissan of Mobile's objections to such recommendations; (iii) failure to consider Nissan of Mobile's objections to the open point; (iv) consideration of factors other than the Mobile market's need for an additional Nissan dealer; and (v) evaluation of Nissan of Mobile's sales performance using an incomplete, non-comprehensive standard (the SSER).  (PageID.277-78.)

For the reasons stated in Section IV.B., *supra*, defendant's Motion for Summary Judgment is **granted**, and plaintiff's Motion for Summary Judgment is **denied**, as to the portion of Count Three that is essentially redundant of Count Two, inasmuch as it is predicated on NNA's use of an allegedly arbitrary or unreasonable sales performance standard.  Furthermore, by all appearances, plaintiff has abandoned the theory in Count Three that defendant "considered factors other than the need of the Mobile market for an additional Nissan brand dealer." (PageID.278.)  Certainly, the record lacks facts supporting a reasonable inference that such extraneous or irrelevant factors were considered.[19]  As such, summary judgment is appropriately granted in defendant's favor on that aspect of Count Three, as well.  The Court will now consider the other components of Count Three.

As a threshold matter, defendant advances a series of legal arguments that it contends are fatal to Count Three in its entirety.  First, NNA maintains that Count Three is legally barred because of what it terms the "specific/general doctrine."  The argument is as follows: Alabama

---

[19]     The Court has scrutinized plaintiff's briefs in detail searching for some indication that it is pursuing an "improper factors" theory for Count Three, much less any suggestion of record evidence identifying what those improper factors might be.  It has found none; rather, this particular subset of Count Three appears to have been overlooked or abandoned, a byproduct of a form of pleading in which plaintiff shoehorned five different theories of wrongdoing into a single enumerated cause of action.

law provides that a specific statute controls a more general statute. *See, e.g., Crawford v. Springle*, 631 So.2d 880, 882 (Ala. 1993) ("Where statutes *in pari materia* are general and specific, the more specific statute controls the more general statute."). NNA characterizes § 8-20-4(3)(*l*) – the section of the MVFA at issue in Count One that forbids a motor vehicle manufacturer from unreasonably appointing a new dealer in the same market area served by an existing dealer – as a specific statute governing challenges to "open point" decisions. By contrast, NNA frames § 8-20-4(2) – the MVFA section at issue in Count Three that bars a manufacturer from acting unreasonably or in bad faith toward a franchise – as a general statute. Applying the "specific/general" canon of statutory construction, then, defendant reasons that "Section 8-20-4(3)(*l*) is the exclusive method of challenging the establishment of the proposed new dealership," such that Count Three must be dismissed. (PageID.1569.)

This argument is flawed in a critical respect, to-wit: It overlooks the well-settled rule that this canon of statutory construction is operative only where the general statute and the specific statute are in conflict. *See, e.g., Nitro-Lift Technologies, L.L.C. v. Howard*, 568 U.S. 17, 21, 133 S.Ct. 500, 184 L.Ed.2d 328 (2012) ("the ancient interpretive principle that the specific governs the general … applies only to conflict between laws of equivalent dignity"); *Perdue v. Green*, 127 So.3d 343, 359 (Ala. 2012) ("when the law descends to particulars, the specific provisions must be understood as exceptions to any general rules laid down to the contrary"); *Springhill Hospitals, Inc. v. State Health Planning and Development Agency*, 224 So.3d 670, 673 (Ala.Civ.App. 2016) ("In the event of a conflict between two statutes, a specific statute relating to a specific subject is regarded as an exception to, and will prevail over, a general statute relating to a broad subject.") (citations omitted); *Herrin v. GreenTree-AL, LLC*, 376 B.R. 316, 321 (S.D. Ala. 2007) ("The rules that a specific statute trumps a general … apply only when two statutes conflict with one another") (internal marks omitted). Despite the rule that "a specific statutory provision trumps a general one," the Eleventh Circuit has instructed that "[i]f any interpretation permits both statutes to stand, the court must adopt that interpretation," barring a clear expression of congressional intent to the contrary. *Miccosukee Tribe of Indians of Florida v. U.S. Army Corps of Engineers*, 619 F.3d 1289, 1299 (11th Cir. 2010) (citation omitted). Defendant identifies no conflict, and indeed no tension, between § 8-20-4(3)(*l*) and § 8-20-4(2). Therefore, the specific/general canon is inapplicable. Moreover, nothing in the text of the MVFA suggests that the Alabama legislature intended to afford primacy to § 8-20-4(3)(*l*), much

less to make that subsection the sole method by which a dealer might challenge specific instances of allegedly unreasonable or arbitrary conduct by a manufacturer that relate in some way to an open point decision. Defendant is not entitled to summary judgment on Count Three on this ground.

Second, NNA articulates a legal argument for dismissal of Count Three based on the nature of the injunction demanded by Nissan of Mobile. According to NNA, the relief sought in Count Three amounts to nothing more than an injunction to obey the law, which is impermissible and improper. Such "obey the law" injunctions are much maligned in the case law, and rightfully so, because they lack specificity and deprive defendants of important procedural protections. *See, e.g., S.E.C. v. Goble*, 682 F.3d 934, 949 (11th Cir. 2012) ("[A]n obey-the-law injunction does little more than order the defendant to obey the law. We have repeatedly questioned the enforceability of obey-the-law injunctions not only in the context of securities cases but other cases as well.") (citations omitted). But the relief sought by Nissan of Mobile in Count Three cannot reasonably be classified as an obey-the-law injunction. To the contrary, Count Three reflects that plaintiff seeks an injunction prohibiting NNA "from creating an open point or appointing any new dealer per the Market Study that was finalized by NNA in breach of the Dealer Agreement." (PageID.278.) The disfavored status of obey-the-law injunctions thus provides no viable basis for granting summary judgment in NNA's favor on Count Three.

Third, NNA reprises its "no injury" argument from Count Two. Again, Nissan of Mobile may validly bring Count Three under § 8-20-11 only if it is "injured in [its] business or property by a violation of this chapter … or because [it] refuses to accede to a proposal for an arrangement which, if consummated, would be in violation of this chapter." *Id.* However, application of that principle to Count Three (concerning alleged unreasonable, bad-faith conduct by NNA in the procedures and protocols it followed in establishing an open point for the West Mobile market) diverges considerably from that to Count Two (concerning NNA's use of the SSER performance standard). On this record, a reasonable finder of fact could conclude that NNA's establishment of an open point would indeed injure Nissan of Mobile in its business or property if and when a dealer is appointed to fill that open point. If, as plaintiff alleges, the open-point decision is the product of multiple procedural actions by NNA that, individually and collectively, amount to unfair and deceptive trade practices under the MVFA, then the injury requirement of § 8-20-11 is satisfied as to Count Three. After all, both logic and common sense,

as well as the statutory language itself, support the proposition that "proposed illegal arrangements which are not consummated but are, rather, stopped by the litigation" suffice to satisfy § 8-20-11. *DaimlerChrysler*, 853 So.2d at 928 (Johnstone, J., concurring). Simply put, Nissan of Mobile says that a series of MVFA violations by NNA resulted in an open point decision that, if implemented, will injure Nissan of Mobile's business or property. It filed suit and asserted Count Three to attempt to block implementation of that open point decision. The Court finds that these circumstances are sufficient to comport with the requirements of § 8-20-11 and to authorize Nissan of Mobile to pursue Count Three against NNA.

Defendant's broad legal arguments for summary judgment as to Count Three being unmeritorious, the remaining analysis of the parties' cross-motions for the § 8-20-4(2) cause of action turn on the presence or absence of record evidence that NNA actually (a) failed to follow the Dealer Agreement in creating an open point, (b) failed to allow Nissan of Mobile to object to the Market Study recommendations or to consider those objections, and (c) failed to consider Nissan of Mobile's objections to the open point. For the reasons stated in sections IV.E. and IV.F., *infra*, the Court finds that genuine issues of material fact preclude entry of judgment as a matter of law on each of these topics. Therefore, the cross-motions for summary judgment are **denied** as to the portions of Count Three alleging violations of § 8-20-4(2) by NNA's failure to follow the Dealer Agreement in creating an open point, failure to allow Nissan of Mobile to object to the Market Study, and failure to consider those objections.[20]

### D. Violation of Alabama Code § 8-20-4.1 (Count Four).

Count Four of the Amended Complaint marks Nissan of Mobile's final claim for relief under the MVFA. In this cause of action, plaintiff invokes the statutory requirement that "[e]very dealer agreement entered into under Act 2010-198 shall impose on the parties the obligation to act in good faith and to deal fairly." Ala. Code § 8-20-4.1. Much like in Count

---

[20]     One further point of clarification is in order. As noted, there are material factual disputes as to whether NNA breached the Dealer Agreement in creating the open point, allowed Nissan of Mobile to object to the Market Study, or considered those objections. If a finder of fact were to determine at trial that NNA indeed engaged in all or some of those specific instances of conduct, it could also reasonably conclude that such activities constituted "action with respect to a franchise which is arbitrary, unconscionable, unreasonable, or is not in good faith," Ala. Code § 8-20-4(2), so as to support a finding of liability against NNA and judgment in favor of Nissan of Mobile on Count Three.

Three, plaintiff pleads that NNA violated § 8-20-4.1 in five distinct respects, to-wit: (i) failing to abide by the terms of the Dealer Agreement; (ii) failing to follow its internal procedures in evaluating whether to create an open point; (iii) failing to follow its internal procedures requiring that market studies be objective, consistent, and include legally defensible analysis and decisional process; (iv) rejecting the market study's recommendation that West Mobile be classified as a "monitored market" and that no open point be created; and (v) basing its open point decision on irrelevant factors. (PageID.278.) Both sides' Rule 56 Motions seek entry of judgment as a matter of law on Count Four.

Significant portions of the summary judgment analysis for Count Four parallel that for Count Three, as addressed in Section IV.C., *supra*. In particular, plaintiff appears to have abandoned – and the record appears devoid of evidence to support – the theory that NNA based its open point decision for West Mobile "upon factors which were not relevant." Accordingly, defendant's Motion for Summary Judgment is **granted** as to that aspect of Count Four. Likewise, NNA presents the same set of global objections to Count Four that it did for Count Three, namely, that it is entitled to summary judgment based on the "specific/general" canon of statutory construction, the overly broad nature of the injunctive relief sought, and the "injured in business or property" requirement. Defendant's specific/general argument fails for precisely the same reasons that it did for Count Three, inasmuch as there is no conflict between § 8-20-4.1 and § 8-20-4(3)(*l*) so the canon is inapplicable. Also, contrary to NNA's contention, Count Four does not seek an improper obey-the-law injunction; rather, the Amended Complaint expressly frames the injunction sought for Count Four as one "prohibiting [NNA] from creating an open point or appointing any new dealer per the Market Study that was finalized by NNA in breach of its duty of good faith and fair dealing." (PageID.278-79.) And the analysis of NNA's argument that Count Four fails for lack of a showing that Nissan of Mobile was injured in its business or property, as is necessary to pursue a claim under § 8-20-11, is exactly the same as it is for Count Three. Thus, defendant's broad legal objections to Count Four are unavailing on summary judgment, just as they were for Count Three.

The cross-motions for summary judgment on the § 8-20-4.1 cause of action require review of the record evidence as to whether NNA did or did not (a) fail to abide by the terms of the Dealer Agreement; (b) fail to follow its internal procedures in evaluating whether or not to create an open point; (c) fail to follow internal procedures allegedly requiring that the market

-21-

study be conducted in a manner that was objective, consistent, and legally defensible; and (d) reject for arbitrary reasons the "monitored market" recommendation of the market study. If the record supports a reasonable inference that NNA did not comply with the Dealer Agreement or its internal procedures as to the open point decision, or that NNA arbitrarily or capriciously rejected the "monitored market" recommendation, then a reasonable finder of fact could also find that NNA violated its good faith and fair dealing obligations to Nissan of Mobile, so as to support liability under § 8-20-4.1 in Count Four.

For the reasons stated in Sections IV.E. and IV.F., *infra*, the Court finds that there are genuine issues of material fact as to whether NNA did or did not comply with the terms of the Dealer Agreement. For that reason, summary judgment is inappropriate for either party as to that component of Count Four.

With regard to defendant's internal procedures relating to market studies and open points, the critical document is entitled *Nissan Dealer Sales and Service Agreement Guide*, Chapter 107 of which is entitled "Market Study." The relevant internal procedures contained in the *Guide* upon which Nissan of Mobile predicates Count Four are as follows: (i) the stated purpose of the Market Study procedure is that market studies be conducted "to ensure an objective, consistent, and legally defensible analysis and decision process to support the market study recommendations;" (ii) market studies must be reviewed and approved by multiple departments and levels of management at NNA before their recommendations are adopted; (iii) among those layers of approval are that "Regional and Divisional management reviews the recommendations, and may agree on actions to be taken the market with final, written approvals" from key NNA officials; (iv) after market study approval is given, NNA reviews the results and recommendations with the dealer in the study area; (v) if an open point is recommended, dealers within 10 miles driving distance must be sent written notification; and (vi) "It is the Region's responsibility to uphold and implement the market study recommendations." (PageID.1401-03.)

It is not clear from the pleadings and briefs precisely how Nissan of Mobile contends that NNA violated the internal procedures as set forth in the *Guide*. In summary judgment briefing, plaintiff acknowledges that "[a]t first, NNA appears to have followed its internal procedure with regard to this market study recommendation." (PageID.1884). However, plaintiff goes on to assert that NNA diverged from these internal procedures when a company official (Delbrueck) tabled the market study to gather additional data, and when NNA ultimately decided one year

later to alter the market study recommendation from monitored market to open point. (*Id.*)  The fundamental defect with plaintiff's argument is that it never explains how any of these complained-of activities contravened defendant's internal procedures.  By all appearances, nothing in the *Guide* forbade NNA from tabling a market study to gather more data or to conduct further review of existing data.  Nothing in the *Guide* forbade NNA from disagreeing with the consultant's initial recommendations in a market study.  Nothing in the *Guide* forbade NNA from interpreting market study data differently than its consultant did, and from modifying a "monitored market" recommendation to an "open point" recommendation on that basis.  Indeed, defendant's evidence is that these were not unusual occurrences.  Following the change in recommendation, all necessary internal approvals (as outlined in the *Guide*) were obtained and notice was given to Nissan of Mobile.  On this record, no reasonable finder of fact could determine that defendant failed to follow its internal procedures in evaluating whether to create an open point or in processing the market study; therefore, defendant's Motion for Summary Judgment is properly **granted** as to this aspect of Count Four.[21]

The remaining basis for Count Four is plaintiff's theory that NNA violated § 8-20-4.1 by "[r]ejecting, for reasons that were not objective or consistently applied," the "monitored market" recommendation in the original market study prepared by its consultant.  (PageID.278.)  On its face, this theory of relief is highly problematic.  As noted, it is undisputed that NNA's decision not to follow its consultant's recommendation in the market study was not extraordinary.  Indeed, as one NNA official explained, "that's not an unusual occurrence.  We don't always agree with Urban Science on their findings."  (PageID.1494.)  The mere fact, then, that NNA did not adopt Urban Science's "monitored market" recommendation cannot support a finding of bad faith so as to give rise to liability under § 8-20-4.1.  Plaintiff endeavors to shore up this claim by

---

[21]    In so concluding, the Court does not embrace defendant's alternative argument that summary judgment is appropriate on this portion of Count Four because "internal company policies generally cannot form the basis of a legal duty or obligation."  (PageID.1562.)  This argument misapprehends the theory of liability underlying Count Four.  As this cause of action has been framed, the legal duty at issue is a statutory duty imposed by § 8-20-4.1 "to act in good faith and to deal fairly."  Any alleged noncompliance with internal procedures would constitute evidence of breach of that statutory duty to act in good faith.  Thus, the internal procedures are not the source of the statutory duty for which plaintiff seeks to hold NNA liable in Count Four, and defendant's argument to the contrary is unavailing.

alleging that NNA rejected the recommendation "for reasons that were not objective or consistently applied." But in what legal doctrine or analytical principle does Nissan of Mobile find support for equating "objective" with "good faith" and "subjective" with "bad faith"? Plaintiff does not say. Of course, logic and common sense confirm that a defendant may reject a consultant's recommendations for subjective reasons, yet still be acting in full compliance with its obligation of good faith and fair dealing.[22] There is no mutual exclusivity between these two concepts. As for the "not consistently applied" argument, where is the evidence that NNA did not consistently apply its reasons for rejecting the Urban Science recommendation as to the West Mobile market to comparable recommendations for similar markets? Once again, Nissan of Mobile does not say. On this record, plaintiff has made an insufficient showing to present Count Four to a finder of fact at trial on the theory that NNA violated § 8-20-4.1 by rejecting Urban Science's recommendation for reasons that were not "consistently applied." Summary judgment will be entered in defendant's favor on this aspect of Count Four.

In sum, defendant's Motion for Summary Judgment is **granted in part** and **denied in part** as to Count Four. The portion of Count Four alleging that NNA breached its duty of good faith and fair dealing under § 8-20-4.1 by failing to abide by the terms of the Dealer Agreement will proceed to trial. All other components of Count Four are **dismissed** because there are no genuine issues of material fact and defendant is entitled to judgment as a matter of law.

### E.     *Breach of Contract (Market Study) (Count Five).*

Count Five of the Amended Complaint sets forth the first of a pair of common-law breach of contract claims. These claims center on the Dealer Agreement between NNA and Nissan of Mobile, and more precisely, the Standard Provisions incorporated into that Agreement. In Count Five, plaintiff maintains that defendant breached the so-called "Dealer Representation Provision" found at Section 4.B.1. of the Standard Provisions, which states as follows:

> "If any [market] study … recommends that an open point be established at a
> location that is within ten (10) miles driving distance … of Dealer's main

---

[22]     In this litigation, Nissan of Mobile has acknowledged – and, indeed, emphasized – that market studies of the kind at issue here do not produce recommendations that are objective, quantifiable and precise. In seeking to exclude NNA's expert, Sharif Farhat, Nissan of Mobile stressed that "the decision point in [the market] analysis is also purely subjective." (PageID.1009.) That inherent subjectivity cuts strongly against plaintiff's theory that NNA's decision to change the market study recommendation based on its reading of the assembled data points somehow evinces bad faith because it was done subjectively.

> Dealership Location, Seller will so notify Dealer.  Dealer will have thirty (30)
> days from Dealer's receipt of notice of the recommendations of the study in
> which to object to them.  … Seller will consider all objections to the
> recommended open point timely made by Dealer."

(PageID.1312.)  The gravamen of Count Five is plaintiff's contention that NNA made a "final decision" to create an open point in West Mobile before providing notice to Nissan of Mobile, that NNA did not furnish Nissan of Mobile with an opportunity to object to the open point determination, and that NNA "gave no consideration" to Nissan of Mobile's objections. (PageID.279.)  Once again, the parties pursue cross-motions for summary judgment on this cause of action.

The two critical factual issues underpinning Count Five are as follows: (i) whether NNA made a final decision to declare an open point before notifying Nissan of Mobile of the market study recommendation; and (ii) whether NNA considered all timely objections made by Nissan of Mobile.  Upon careful review of the summary judgment record, the Court finds that genuine issues of material fact preclude definitive resolution of these fact questions at this time.  As an initial matter, the Dealer Agreement is clear that NNA was required to notify Nissan of Mobile of the "open point" recommendation in the market study, to allow Nissan of Mobile 30 days from receipt of such notice to make objections, and to consider all such objections timely made by Nissan of Mobile.  Accordingly, if NNA did not take these procedural steps, then it was in violation of the Agreement as pleaded in Count Five.  But the record reasonably supports competing factual inferences on these points.

As to the timing of NNA's decision, there is limited record evidence that would reasonably support a finding that NNA had concluded that it was definitely going to declare an open point in West Mobile before it ever made a presentation to Nissan of Mobile on the market study and its recommendations.  If NNA's mind was already made up that an "open point" was being created before it ever notified the dealer, then it was in breach of its contractual obligations to provide the dealer with notice of the "open point" recommendation, to allow the dealer an opportunity to object, and to consider those objections before making a final, irrevocable decision.  However, there is also evidence in the record reasonably supporting an inference that NNA had merely completed all the requisite internal approvals of the "open point" decision when it provided notice to Nissan of Mobile, that the market study recommendation was nothing more than a recommendation (and certainly was not carved in stone) when dealer notice was

given, and that NNA received and considered Nissan of Mobile's objections before making a final decision to move forward with declaring an open point. Conflicting facts and inferences in the record preclude entry of summary judgment for either side on this issue.

Separately, the parties spar over whether NNA actually considered Nissan of Mobile's objections. The undisputed facts are that NNA's Dealer Operations Manager met with Nissan of Mobile's General Manager in person on March 15, 2017, to review the results of the study, and that the same NNA official presented that information telephonically on the same date with the person listed as the dealer on the Dealer Agreement. Neither Nissan of Mobile representative articulated any contemporaneous objections to the "open point" recommendation. It is further undisputed that NNA transmitted a letter to Nissan of Mobile on March 30, 2017, formally notifying plaintiff of the market study's recommendation that an open point be established in West Mobile. And the record is uncontroverted that on April 18, 2017, Nissan of Mobile met with NNA officials and expressed objections that the data used in the market study was stale and that any brand coverage/representation issues might be addressed by establishing a service-only location in West Mobile. Where ambiguity and uncertainty emerge in the record is on the question of whether NNA "considered" these objections or not. Defendant says it did, but promptly and summarily rejected them without conducting any further analysis. Plaintiff says it did not, because the fix was in and the decision was already made. The summary judgment record reasonably supports each of these conflicting inferences. Plainly, then, key fact questions remain as to whether defendant did or did not breach the Dealer Agreement as alleged in Count Five.[23]

---

[23] For its part, NNA endeavors to sidestep the fact-intensive, disputed question of whether it actually considered Nissan of Mobile's objections by pointing to contract language obligating it to consider only those "objections to the recommended open point ***timely made*** by Dealer." (PageID.1312 (emphasis added).) Defendant's argument is that Nissan of Mobile failed to make any <u>timely</u> objections, such that NNA was not contractually bound to consider any of them. This contention cannot prevail on summary judgment. As indicated, the Dealer Representation Provision specified that Nissan of Mobile "will have thirty (30) days from [its] receipt of ***notice*** of the recommendations of the study in which to object to them." (*Id.* (emphasis added).) By the express terms of the Dealer Agreement, "[a]ll ***notices or notifications*** required or permitted to be given by this Agreement to either party shall be sufficient only if given in writing and delivered personally or by mail …." (PageID.1313 (emphasis added).) The undisputed record facts are that NNA first gave Nissan of Mobile <u>written</u> notice of the "open point" recommendation of the market study on March 30, 2017; therefore, Nissan of Mobile's

-26-

### F.     Breach of Contract (Sales Evaluation) (Count Six).

Finally, in Count Six of the Amended Complaint, Nissan of Mobile pursues another breach of contract claim against NNA, this one predicated on the theory that NNA's method of evaluating Nissan of Mobile's sales performance (again, via the SSER computation) violates the Dealer Agreement.  In that regard, plaintiff relies on Sections 3.B. and 3.D. of the Standard Provisions.  The former provision specifies that "Dealer's performance of its sales responsibility for Nissan Cars and Nissan Trucks will be evaluated on the basis of such reasonable criteria as Seller may develop from time to time."  (PageID.1310.)  And the latter states as follows:

> "Where appropriate in evaluating Dealer's sales performance, Seller will take into account such reasonable criteria as seller may determine from time to time, including, for example, the following: the Dealership Location; the general shopping habits of the public in such market area; the availability of Nissan Vehicles to Dealer and to other Authorized Nissan Dealers; any special local marketing conditions that would affect Dealer's sales performance differently from the sales performance of other Authorized Nissan Dealers; the recent and long term trends in Dealer's sales performance; the manner in which Dealer has conducted its sales operations (including advertising, sales promotion, and treatment of customers); and the other factors, if any, directly affecting Dealer's sales opportunities and performance."

(PageID.1310-11.)  Both sides seek summary judgment on Count Six.

The crux of Nissan of Mobile's summary judgment argument is that the SSER performance standard is not a "reasonable" criterion for evaluating its sales performance, as required by the Dealer Agreement.  Plaintiff elaborates that SSER is not a reasonable performance standard because it fails to take into account and to make adjustments for local market conditions, such as the number and proximity of competitive dealerships, the volume of

---

30-day period for lodging objections commenced on that date.  It is likewise undisputed on this record that Nissan of Mobile articulated its objections to NNA on April 18, 2017, a date well within the 30-day period established by the Agreement.  As such, plaintiff's objections were made in a timely fashion, and defendant was contractually obligated to consider them.  In arguing otherwise, NNA suggests that Nissan of Mobile's objections were required to be in writing; however, it points to no provision in the Dealer Agreement that would set forth such a written requirement for objections.  At best, NNA asserts that these objections fell within the requirement that "all notices or notifications" must be in writing; however, defendant fails to explain how or why an "objection" can or must be equated to a "notice or notification," contractually speaking, for purposes of imposing a writing requirement.  For all of these reasons, the Court does not credit NNA's assertion that it was excused from considering Nissan of Mobile's objections because such objections were not timely made.

customers who may qualify for NNA incentive programs, or other local demographic factors. Plaintiff further balks that the unreasonableness of the SSER tool is underscored by the fact that it fails to account for any of the specific factors enumerated in Section 3.D. of the Dealer Agreement.

For its part, NNA advances a series of contentions to the contrary. First, it asserts that "Plaintiff expressly agreed to Nissan's use of SSER … when it entered into the Dealer Agreement." (PageID.1955.) Second, it maintains that plaintiff's witnesses Pete DeLongchamps and David Fesmire conceded the reasonableness of SSER as a measure of dealer sales performance. (PageID.1565, 1955-56.) Third, it contends that SSER is a reasonable means of evaluating dealer sales performance because (i) "SSER takes into account all sales made by the dealer nationwide, while the competitive registrations the dealer is measured against are limited to registrations within the dealer's PMA;" (ii) the competitive registrations to which Nissan of Mobile's sales are compared take into account vehicle segmentation, through which "SSER accounts for customer preferences, income and other local factors;"[24] and (iii) local economic conditions are captured by SSER's utilization of the volume of competitive registrations, which will be lower if economic conditions in a particular area are depressed, because customers in that area will not be able to afford to purchase competing brands any more than they can afford to purchase Nissans. (PageID.1563, 1950-51.)

After careful review of the summary judgment record and the respective arguments of counsel, the Court concludes that there are genuine issues of material fact as to whether SSER is a "reasonable" criterion for evaluating Nissan of Mobile's sales performance, as required under the Agreement. Defendant's assertion that plaintiff expressly agreed to the use of the SSER performance standard is not supported by the record. To be sure, Sections 3.B.3. and 4. of the

---

[24] Segmentation involves separating vehicles into various market segments (*i.e.*, mid-size sedan, full-size pickup truck, etc.) based on vehicle size, price, function, and so on. Defendant's position is that segmentation takes into account local market conditions and variables such as income, socioeconomic status, demographics, and customer preferences because different vehicle segments appeal to (and are purchased by) customers in different demographic and economic categories. Defendant's evidence is that the segmentation process achieves precisely the function that plaintiff says is missing from the SSER calculations. (PageID.2024 (explaining segmentation adjustment as correcting for "differences with regard to what consumers want and need that's not … strongly influenced by the dealer").)

Standard Provisions do specify as examples of "reasonable criteria" that NNA may use to evaluate dealer performance "[a] comparison of Dealer's sales and/or registrations to sales and/or registrations of all other Authorized Nissan Dealers combined in Seller's Sales Region and District in which Dealer is located;" and "[a] comparison of sales and/or registrations achieved by Dealer to the sales or registrations of Dealer's competitors." (PageID.1310.) But to agree generally to sales performance metrics involving comparisons of Nissan of Mobile's sales to those of other Nissan dealers in a sales region, or of Nissan of Mobile's sales to those of competing brands, is not equivalent to agreeing to SSER specifically.[25] Nowhere in the Dealer Agreement did NNA delineate the SSER computation methodology, and nowhere therein did Nissan of Mobile agree that SSER is a reasonable method of evaluating sales performance. It is the specific contours, features and omissions of the SSER with which Nissan of Mobile finds fault and to which it ascribes unreasonableness, not the general notion of a performance standard comparing Nissan of Mobile's sales to those of other Nissan dealers or dealers of competing brands in a particular sales region. Plaintiff has not expressly agreed to the use of SSER as a reasonable sales evaluation metric.

Furthermore, a fair reading of the record does not compel a finding that Nissan of Mobile's witnesses have acknowledged the reasonableness of the SSER metric. Careful examination of the Fesmire deposition reveals that he agreed only that "SSER is an example of … a means of evaluating sales effectiveness," but then expressly disagreed that SSER was used properly or that it was fair to Nissan of Mobile. (PageID.2036.) And while DeLongchamps testified to his opinion that SSER is "a reasonable way" to measure dealer sales performance, he went on to qualify that statement that it was only reasonable "[a]s long as it's consistent" and he was "not familiar" with "hard data" as to whether it was consistent or not. (PageID.1633-34.) Plaintiff's objections to reasonableness of SSER on summary judgment go directly to the

---

[25]     For example, the Dealer Agreement is framed in terms of comparisons to other Nissan dealers "in Seller's Sales Region and District." But SSER is predicated on comparing Nissan of Mobile's sales performance to that of Nissan dealers in represented markets within the state of Alabama, not those in Nissan of Mobile's "Sales Region and District." Plaintiff argues extensively on summary judgment that those geographic parameters for the comparison group (*i.e.*, represented markets within the state of Alabama) contribute significantly to the unreasonableness of the SSER measure as a whole. Plaintiff certainly never acquiesced to the reasonableness of that feature of SSER.

question of consistency. Thus, the Court does not find that NNA is entitled to summary judgment on Count Six on the ground that Nissan of Mobile has conceded the reasonableness of SSER as a sales performance standard in this case.

The ultimate question of the reasonableness *vel non* of the SSER performance standard is not amenable to resolution on summary judgment. Both sides have assembled facts to support their respective positions as to reasonableness. The SSER criterion takes certain factors into consideration, while excluding other potentially significant factors. It makes certain judgments and weighs certain factors in a manner that may be viewed as reasonable through one lens, or unreasonable through another. The parties' summary judgment briefs, which devote numerous pages to exploring the minutiae of SSER, bear that out. Under the circumstances, a considered assessment of reasonableness is best accomplished on a fully developed trial record, including hearing from the parties' respective expert witnesses, rather than on summary judgment. Accordingly, the Court finds that fact questions remain as to whether defendant did or did not breach the Dealer Agreement in the manner alleged in Count Six.

## G. *Irreparable Harm and Counts Five and Six.*

One final issue relating to the viability of the common-law contract claims found at Counts Five and Six remains to be addressed. In its Motion for Summary Judgment, NNA cites well-settled law for the general proposition that a plaintiff cannot obtain a permanent injunction without showing a substantial threat of irreparable injury. *See, e.g., Triple J Cattle, Inc. v. Chambers*, 551 So.2d 280, 282 (Ala. 1989) ("The primary reason for issuing an injunction is to prevent an irreparable injury …."); *Ex parte B2K Systems, LLC*, 162 So.3d 896, 904 (Ala. 2014) ("Our cases hold that a preliminary injunction should be issued only when the party seeking the injunction can demonstrate that, without the injunction, he or she would suffer irreparable injury for which there is no adequate remedy at law."); *Gagliardi v. TJCV Land Trust*, 889 F.3d 728, 734 (11th Cir. 2018) ("an injunction cannot be fashioned when the prospect of future injury is only speculative; again, there must be a likelihood of substantial and immediate irreparable injury") (citation and internal quotation marks omitted). Neither Count Five nor Count Six includes a claim for damages; rather, for the former claim, Nissan of Mobile seeks an injunction "prohibiting NNA from creating an open point … or appointing a new dealer in west Mobile in violation of the Dealer Agreement," and for the latter claim, Nissan of Mobile seeks an injunction "prohibiting NNA from evaluating Nissan of Mobile's sales performance upon any

criteria that does not take into account reasonable criteria directly affecting Nissan of Mobile's sales opportunity and performance." (PageID.280.) Defendant's argument, quite simply, is that it is entitled to summary judgment on the common-law claims found at Counts Five and Six because plaintiff has made no showing of a substantial threat of irreparable injury with regard to either the creation of the open point or the use of SSER.

Of course, "[i]rreparable injury is an injury that is not redressable in a court of law through an award of money damages." *Slamen v. Slamen*, 254 So.3d 172, 175 (Ala. 2017) (citations and internal quotation marks omitted). By all appearances, any lost profits that Nissan of Mobile might incur via appointment of a new dealer in West Mobile and any foregone incentive payments or other losses resulting from use of SSER as a sales performance evaluation tool would be redressable through an award of money damages. In response to this argument, plaintiff remains silent. It offers no plausible basis for finding that either (i) the "irreparable injury" requirement is inapplicable to Counts Five and Six, or (ii) plaintiff has any evidence that might support a finding of irreparable injury as to those counts. Instead, Nissan of Mobile's lone argument on this point is that "even if Nissan of Mobile does not meet elements required for an injunction under the common law or civil procedure rules, Nissan of Mobile's entitlement to an injunction under the MVFA remains unaffected." (PageID.1904.) In other words, plaintiff effectively capitulates on the "irreparable injury" requirement for Counts Five and Six, but urges the Court to deem it inapplicable to the statutory claims found at Counts One through Four.

In sum, then, defendant has made an uncontested showing that the sole relief sought by plaintiff in Counts Five and Six is an injunction barring defendant from using SSER or creating an open point in West Mobile, that such an injunction cannot be granted without a showing of a substantial threat of irreparable injury, and that the record lacks any reasonable basis for finding that Nissan of Mobile's complained-of injuries are "irreparable," or incapable of being redressed through money damages. For that reason, defendant's Motion for Summary Judgment is **granted** as to Counts Five and Six for lack of a showing that the form of relief sought by plaintiff is or may be available.[26]

---

[26] Two additional points bear emphasis. First, although this ruling dismisses Counts Five and Six, it does not foreclose plaintiff's claims under the MVFA that are predicated on breaches of the Dealer Agreement. To the extent, as discussed *supra*, those alleged breaches of the Dealer Agreement may be actionable through particular provisions of the MVFA, those

**V.**     **Conclusion.**

For all of the foregoing reasons, it is **ordered** as follows:

1.     Plaintiff's Motion for Summary Judgment (doc. 110) is **denied**;

2.     Defendant's Motion for Partial Summary Judgment (doc. 111) is **granted in part**, and **denied in part**, as set forth above;

3.     The remaining claims and causes of action joined for trial are as follows:

   a.     Count One (violation of § 8-20-4(3)(*l*) by unreasonably entering into a franchise with another dealer in plaintiff's market area);

   b.     Count Three (violation of § 8-20-4(2) by engaging in arbitrary, unconscionable, unreasonable, or bad-faith conduct, but only as to the specific instances recited in Paragraph 24(a)-(c) of the Amended Complaint, namely, failure to follow the Dealer Agreement in creating the open point, failure to allow plaintiff to object to the Market Study, and failure to consider plaintiff's objections to the open point); and

   c.     Count Four (violation of § 8-20-4.1 by failure to act in good faith in not abiding by the terms of the Dealer Agreement); and

4.     All other claims and causes of action asserted in the Amended Complaint are **dismissed with prejudice** because there are no genuine issues of material fact, and defendant is entitled to entry of judgment in its favor as a matter of law.

DONE and ORDERED this 16th day of October, 2019.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

issues remain properly joined for trial.  Second, defendant would apply this same lack-of-irreparable-harm rationale to move for summary judgment on each of the MVFA claims found at Counts One through Four.  In response, however, plaintiff points out that the requirements for an injunction under the MVFA are specifically set forth in Alabama Code § 8-20-11, and that nowhere does that statute require proof of irreparable injury.  (PageID.1904.)  Defendant, as summary judgment movant, does not address this argument in its Reply, and the Court will not endeavor to formulate an argument on movant's behalf.  Therefore, summary judgment will not be entered in NNA's favor on the statutory claims on a theory of lack of irreparable injury.